In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1942 & 99-1943

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DAISY E. WALLS
and SHAREE S. WILLIAMS,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 296--David H. Coar, Judge.

Argued November 10, 1999--Decided August 15, 2000

Before POSNER, ROVNER, and DIANE P. WOOD, Circuit
Judges.

ROVNER, Circuit Judge.  Daisy Walls and Sharee S.
Williams were convicted after a jury trial of
conspiracy to possess with intent to distribute
and conspiracy to distribute substances
containing cocaine in violation of 21 U.S.C. sec.
846, and possession with intent to distribute
approximately four kilograms of cocaine in
violation of 21 U.S.C. sec. 841(a)(1). Williams
was also convicted of knowingly possessing a
firearm as a felon in violation of 18 U.S.C. sec.
922(g)(1). They now appeal those convictions.
I.

On April 22, 1998, Federal Express ("FedEx")
identified as suspicious two packages that were
purportedly shipped by the Renaissance Electrical
Supply Company in Los Angeles, California, for
delivery to Tascam Electrical Supply Company at
9121 S. Colfax in Chicago, to the attention of
Daisy Walls. FedEx employees conducted a field
test on the contents of the packages, which
revealed the presence of cocaine. The employees
then reported the results of their investigation
to Phillip Barnett, who was commissioned by the
Shelby County Sheriff's Office and assigned to
the DEA Drug Task Force. Barnett subsequently
traveled to the FedEx office and conducted his

own test of the packages, which yielded the same results. The DEA agents were unable to verify any businesses using the names indicated on the packages, and decided to make a controlled delivery of the packages to the Chicago destination. A court-ordered break-wire device was inserted into each package to enable the agents to track the packages after the delivery was accomplished. If a package was opened, the wire would break and the signal being transmitted by the wire to the agents monitoring it would cease. Agent Markhart then donned a FedEx uniform and drove to 9121 S. Colfax in a truck with FedEx markings. Approximately fifteen undercover agents dispersed in the area surrounding the residence. Agent Markhart arrived at 9121 S. Colfax (which was a private residence) at approximately 5:30 p.m. on April 23, 1998. As he approached the residence he passed two persons standing in front of it, and one of them yelled toward the house "Mama, your package is here." Daisy Walls ("Walls") answered his knock, and he apologized for the late delivery because the packages had been scheduled for delivery the previous day. When he requested a signature for the packages, Walls turned to a male standing just inside the door, who was later identified as her son Daniel Walls, and asked him to sign. He scrutinized Markhart and declined to sign. Walls then said "I'll sign the electric company." Until that time, Walls could not have seen the address labels on the packages and Agent Markham had not mentioned that the addressee was an electrical company. Walls then examined the packages and signed Tascam Electric, DGW. During this exchange, Markhart noticed approximately 10-15 people in the front room of the house, apparently having a party.

After Agent Markhart's departure, Sharee Williams and Daniel Walls exited the rear of the house with the packages, and proceeded down the alley and into the rear basement door of 9127 S. Colfax. Shortly thereafter, the two emerged from the basement and Williams returned to 9121 S. Colfax while Daniel Walls went to the front of 9127 S. Colfax and began speaking on a cellular phone. Approximately 8 to 10 males, aged 18 to 24, were in the alley behind 9127 S. Colfax at this time, and a car was circling the block. At that moment, the signal being transmitted from one of the packages stopped. Concerned about maintaining control over the cocaine, the agents proceeded to 9127 S. Colfax and, when their knock received no response, they forcibly entered the dwelling. They found the unopened packages on a table immediately inside. The agents then went to 9121 S. Colfax and knocked on the screen door. A number of people inside shouted obscenities at them and told them they would not open the door

without a search warrant. Daisy Walls then appeared at the door. The agents identified themselves and informed her that they were there on an investigation concerning the two packages that had been delivered. Without saying anything, she then opened the door and stepped back. Once they had entered, she motioned to them from the hallway to follow her into the kitchen. After hearing and acknowledging her Miranda rights, Walls stated that this was the third time she had accepted similar packages, that she did not know what it contained the first time but that she opened the second one out of curiosity and discovered it contained cocaine, and that she knew the third package contained cocaine as well. She told the agents that the packages belonged to Delano Target, a member of the Gangster Disciples street gang.

After arresting Walls, the agents brought Williams into the kitchen. She declared that she had nothing to hide and gave written consent for the search of her basement apartment at 9127 S. Colfax. A search of the basement apartment revealed: a clear plastic bag containing marijuana in a dresser drawer; approximately $4000 in U.S. currency inside a basket of clothes; approximately $1000 in U.S. currency in a safe; and a box of rubber gloves, tinfoil, plastic bags, white powder, paper masks, and a digital scale, all of a type used in packaging and weighing cocaine for sale, on or near the kitchen table. In addition, the search yielded a Ravens Arms .25 caliber firearm in a dresser drawer of the bedroom. A photograph taken by the agents revealed some clothes next to the firearm, which appeared to be boxer shorts and a tie or possibly a scarf. At the DEA office, Williams acknowledged her Miranda rights and signed a written statement declaring that she was at Walls' house when the package arrived, that she saw the package on the table and knew it contained drugs but did not know the type or quantity, and that Walls wanted the packages removed from her house and she volunteered to take them to her home. A jury convicted Walls and Williams on all charges, and they now raise a multitude of challenges to those convictions.

II.

Walls first contends that the initial search of the FedEx packages by the FedEx employees violated the Fourth Amendment because it was a joint endeavor between deputy sheriffs and FedEx employees. As support for this argument, Walls points to testimony at trial that Gheric Bruce, the security officer for FedEx who conducted the initial search of the package in Memphis, was also a commissioned officer of the Shelby County

Sheriff's Department. He had been an employee of FedEx for 11 years, and the scope of his involvement with the Sheriff's Department is unclear other than his testimony that he was not a sheriff's deputy but was commissioned by the Department.

This argument was raised for the first time in this appeal, and is waived. Prior to trial, Walls moved to suppress the contents of the packages on the basis that private investigators and private police should be subject to the strictures of the Fourth Amendment under Marsh v. Alabama, 326 U.S. 501 (1946). In Marsh, the Court held that a "company town" was subject to the First Amendment because in all respects save ownership it functioned as any other town, and the private ownership could not alone defeat the protections of the Constitution. Id. at 507-08. Walls thus tendered Marsh for the proposition that a private party may be considered a state actor under the Constitution to the extent it supplants the traditional roles of a government and performs public functions. Walls contended that the Marsh rationale applied here because "the activities of Federal Express, which have procedures to investigate large quantities of documents and materials that are placed for mail delivery, causes it to engage in a public function." We need not address this public function argument because Walls has abandoned it on appeal in favor of the new argument that the FedEx employee was operating as an agent of the government during the search. As justification for the failure to raise it earlier, Walls asserts that she did not learn until trial that the FedEx employee was also affiliated with the sheriff's office. Although that is relevant to the failure to raise the issue pre-trial, it does nothing to excuse the failure to raise it during or after the trial. Both during the trial and in a post-trial motion, Walls merely reiterated her disagreement with the court's ruling on her initial motion to suppress. At no point did Walls raise the new argument for suppression. Accordingly, this argument was not raised in the district court, and is forfeited. United States v. Olano, 507 U.S. 725, 731-35 (1993). Walls has not argued, and we do not find, any plain error. Id.

Walls next challenges DEA Drug Task Force member Barnett's field test of the contents of the package. She maintains that the search was constitutionally defective because Barnett was not told why the package was suspicious prior to conducting the test, and the cocaine was not in plain view. That characterization of the facts is belied by the very testimony quoted in Walls' brief. Barnett testified that before he conducted the field test, he was informed that FedEx had

already tested the contents of the package and believed it contained cocaine. It is irrelevant that he did not know details concerning the test such as the name of the person who conducted it. Walls' argument relies on selective use of testimony and is frivolous.

The final argument raised by Walls is that the government agents' entrance into her home at 9121 S. Colfax violated the Fourth Amendment because she did not consent to the agents' entrance. A warrantless entry into a residence to effect an arrest is presumptively unreasonable under the Fourth Amendment. Payton v. New York, 445 U.S. 573, 586 (1980); United States v. Saadeh, 61 F.3d 510, 516 (7th Cir. 1995). Where, however, someone with authority to do so consents to the entry, the entry is reasonable and the Fourth Amendment is not violated. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). We examine the totality of the circumstances to determine whether a consent is voluntary, or the product of duress or coercion. Id. at 227.

The record is devoid of evidence that the consent in this case was involuntary. A large group of people was at the residence with Walls at the time the agents approached, and their conduct indicates that they were neither intimidated by the agents' presence nor ignorant of the right to refuse entrance. When the agents knocked at the door, the occupants of the house refused to open the door and shouted that the agents could not enter and that they needed a warrant, addressing them with vulgar and profane language. Moreover, when Walls came to the door, the agents identified themselves and informed her that they were conducting an investigation regarding the two packages that had been delivered. In response to that statement, Walls opened the door and stepped back to allow their entrance. The district court held that her actions constituted consent to their entry, and we will reverse that decision only if it is clearly erroneous. United States v. Durades, 929 F.2d 1160, 1163 (7th Cir. 1991). It is well established that consent may be manifested in a non-verbal as well as a verbal manner, United States v. Cotnam, 88 F.3d 487, 495 (7th Cir. 1996), and her action in opening the door and stepping back to allow the entry was sufficient to convey her consent in these circumstances. See, e.g. United States v. Rosario, 962 F.2d 733 (7th Cir. 1992) (upholding consent where occupant of motel room gestured for the officers to enter and stepped back, opening the door). Her consent is further illustrated by her actions after they entered the residence in motioning for them to follow her to the kitchen where she could speak with them privately.

Walls' reliance on Johnson v. United States, 333 U.S. 10, 13 (1948), is misplaced, because in Johnson the officers demanded entry under color of office, and consent to their entry was granted "in submission to authority rather than as an understanding and intentional waiver of a constitutional right." In contrast, no evidence was presented in this case that the agents demanded entry, or that Walls allowed them entry "in submission to authority" rather than voluntarily. This conclusion is further buttressed by the refusal of the other occupants of the home to allow them entry, demonstrating that the atmosphere was not one of intimidation. There is simply nothing in the sequence of events that evidences coercion or duress, and the trial court did not err in holding that she voluntarily consented to the entry. Accordingly, Walls' conviction is affirmed.

III.
A.

 Williams also raises a number of challenges to her convictions and her sentence, and fares somewhat better. First, Williams argues that the court erred in redacting a portion of the statement that she gave to the police. The statement, with the redacted portion in italics, read as follows:

I noticed the package was on the table. I knew drugs were in the package but I did not know what kind of drugs or how much was in it. Daisy probably knows who the contact person is. Daisy said get this shit out of here, and I volunteered to take it to my house. I think Daisy knew drugs were in the package. I put it on the basement table in my house where I stay at.

Williams objected to the redaction of "Daisy said get this shit out of here," which preceded Williams' offer to take the package to her house. According to Williams, the prefatory phrase was not damaging to Walls and thus need not have been redacted, whereas it was essential for a fair understanding of her offer to remove the package. We cannot agree with that characterization. Under Bruton v. United States, 391 U.S. 123 (1968), the court properly redacted the statements concerning Daisy Walls. The portion of the sentence that Williams identifies was incriminating to Walls because a jury could interpret it as evidencing knowledge by Walls that the package contained contraband. We review the decision to redact for abuse of discretion, and find none here. United States v. Hubbard, 61 F.3d 1261, 1277 (7th Cir. 1995). Once the court ruled that the redaction was necessary, Williams could have moved for a

severance if she believed that the redaction prejudiced her defense, but she failed to do so. Therefore, she has waived any such claim here. We further note, however, that Williams cannot demonstrate any prejudice from the exclusion of those sentences. In fact, the redacted sentences would have merely reinforced the impression that Williams was involved in the conspiracy. Her willingness to volunteer her services in transporting the packages does not become less incriminating when proceeded by a co-conspirator's general request that someone remove the contraband. With the challenged phrase included, a natural reading of the statement is that Walls wanted the drugs removed from her home and that Williams, realizing the packages contained illegal drugs, volunteered to do so. That essentially confirms her role as a courier in an effort to facilitate the cocaine conspiracy. Furthermore, any potential prejudice was eliminated because Williams elicited through other trial testimony that Walls had told her to remove the packages. Therefore, we find no error in the court's decision to redact those sentences, and no prejudice to Williams resulting from that redaction.

B.

 Williams also attacks her conviction for possession of a firearm as a felon under 18 U.S.C. sec. 922(g)(1). In order to obtain a conviction for felon-in-possession under that provision, the government must establish beyond a reasonable doubt that (1) the defendant had a previous felony conviction, (2) the defendant possessed a firearm, and (3) the firearm had traveled in or affected interstate commerce. United States v. Moore, 936 F.2d 1508, 1525 (7th Cir. 1991); United States v. Garrett, 903 F.2d 1105, 1110 (7th Cir. 1989). Only the possession element is at issue here. It is well-established that possession under that statute may be demonstrated through either actual or constructive possession. United States v. Kitchen, 57 F.3d 516, 520 (7th Cir. 1995). Actual possession is demonstrated if a person knowingly has direct physical control over a thing at a given time. Id. at 524 n.2. Where that direct physical contact is lacking, a defendant may nevertheless have constructive possession if she "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." United States v. Hunte, 196 F.3d 687, 692 (7th Cir. 1999); Garrett, 903 F.2d at 1110 (emphasis omitted). Those means of establishing possession are uncontroversial and were pursued by the government in this case. In addition, however, the government also sought to prove the element

of possession under a theory of vicarious liability premised on the Supreme Court's decision in Pinkerton v. United States, 328 U.S. 640 (1946). Under that theory, Williams could be found guilty of possessing the firearm as a felon even if she lacked either actual or constructive possession, as long as another member of the conspiracy possessed a gun. The government made no real effort to produce any evidence regarding the co-conspirator who possessed the firearm. Williams' defense theory, however, appeared to be that Samuel Simmons, Walls' son, was the one involved in the drug dealing and that she was unaware of it. The government presumably proffered the Pinkerton instruction for the proposition that if Williams did not possess the gun found in her apartment, then her roommate, Samuel Simmons, must have possessed it and that he was a co-conspirator because she attributed the drugs to him. Williams objected to the submission of the Pinkerton instruction to the jury, but the court ruled in the government's favor.

In order to properly determine the applicability of Pinkerton to this case, we must examine the basis for the Pinkerton ruling. The holding in Pinkerton flowed from a number of established propositions. First, a person may be convicted both for a conspiracy and a substantive offense, and "it is not material that overt acts charged in the conspiracy count were also charged and proved as substantive offenses." Id. at 643-44. Second, an overt act of one conspirator may be the act of all without any new agreement specifically directed to that act. Id. at 646-47. The Court then considered whether a conspirator could be found guilty of the substantive offense committed by a co-conspirator in furtherance of the conspiracy. It held that the governing principle should be the same where the overt acts in the conspiracy constitute a substantive offense, and that a conspirator could be convicted of the substantive offense committed by a co-conspirator as long as the offense was committed in furtherance of the conspiracy, fell within the scope of the unlawful project, and was reasonably foreseeable as a necessary or natural consequence of the unlawful agreement. Id. at 647-48.

In accordance with that reasoning, we have held that

the jury [asked to decide a case under the Pinkerton doctrine] must be made to focus on the coconspirator's act, on whether it is a crime, on whether the coconspirator's guilt of this crime was proved beyond a reasonable doubt, and on whether it was committed in furtherance of the

conspiracy in which the defendant participated.

United States v. Manzella, 791 F.2d 1263, 1268 (7th Cir. 1986). See also United States v. Sandoval-Curiel, 50 F.3d 1389, 1394-95 (7th Cir. 1995); United States v. McKenzie, 922 F.2d 1323, 1330 (7th Cir. 1991); United States v. Diaz, 864 F.2d 544, 549 (7th Cir. 1988). The government's use of Pinkerton in this case takes this one step farther in that it seeks Pinkerton liability based in part upon acts by a co-conspirator that did not constitute the crime. There are no allegations that a co-conspirator was guilty of violating sec. 922(g)(1). Instead, the government uses a cut-and-paste approach, taking the firearm possession by one conspirator, adding it to the felon status of another conspirator, and thereby creating a substantive offense for that second conspirator. It is a significant expansion of the Pinkerton doctrine that appears to be difficult to limit.

For instance, under such a use of Pinkerton, even lawful possession of a firearm by a conspirator could presumably be used to establish a sec. 922(g)(1) violation for a co-conspirator who is a felon. Moreover, one can easily imagine a large-scale conspiracy, in which a conspirator's possession of a firearm in California is used to obtain a felon-in-possession conviction of a co-conspirator in Illinois. This seems far afield from the purpose of the felon-in-possession prohibition, which is to "keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." Lewis v. United States, 445 U.S. 55, 64 (1980), quoting Barrett v. United States, 423 U.S. 212, 218 (1976). It is an unwarranted, and possibly unconstitutional, expansion of the Pinkerton doctrine. See United States v. Castaneda, 9 F.3d 761, 766 (9th Cir. 1993) ("due process constrains the application of Pinkerton where the relationship between the defendant and the substantive offense is slight").

Finally, the felon-in-possession statute seems a particularly inappropriate vehicle for such an expanded use of Pinkerton liability. It criminalizes conduct that could otherwise be lawful based upon the status of the person engaging in that conduct. United States v. Jester, 139 F.3d 1168, 1170 (7th Cir. 1998) (recognizing status as one element of a sec. 922(g)(1) violation). As stated above, Congress enacted sec. 922(g)(1) "in order to keep firearms out of the hands of those persons whose prior conduct indicated a heightened proclivity for using firearms to threaten community peace and the 'continued operation of the Government of the United States.'" Id. at 1171. Consistent with

that end, it exempts certain non-violent offenders from its reach. See 18 U.S.C. sec. 921(a)(20)(A) (exempting, e.g., persons convicted of antitrust violations, unfair trade practices, restraints of trade, and other similar offenses relating to the regulation of business practices). That differentiation among felons based on the nature of their felonies survives equal protection scrutiny precisely because Congress could reasonably conclude that firearms would pose a higher risk of danger to the public if in the hands of the felons covered by sec. 922(g)(1), than they would in the hands of the relatively non-violent felons excluded from the statute. Id. The government's proposed application of Pinkerton, however, would eviscerate that justification. The firearm in the hands of a non-felon (who lacks the criminal conviction that betrays a proclivity to threaten public safety) could be used to impose vicarious criminal liability on a felon (who lacks the firearm that threatens the public). The danger to the public rationale underlying the statute thus ceases to be relevant.

Theoretically, the application of Pinkerton here would also invite the future inverse use of the doctrine to attribute a felon's possession of a firearm to his non-felon co-conspirator. A non-felon could be deemed guilty of being a felon in possession of a firearm. That ridiculous prospect reveals the fundamental problem with extending Pinkerton liability to the felon-in-possession statute. Because sec. 922(g)(1) defines the offense in terms of the status of the individual possessing the firearm, the vicarious liability provisions of Pinkerton are inappropriate for such an offense. Accordingly, the district court erred in submitting the Pinkerton instruction to the jury on the sec. 922(g)(1) charge.

The government nevertheless asserts that the verdict is supported under the alternative theories of actual or constructive possession. We have in the past examined whether a conviction can be upheld based on alternative theories of liability where a Pinkerton instruction was improperly given. See, e.g., United States v. Elizondo, 920 F.2d 1308, 1317 (7th Cir. 1990). In the recent case of Neder v. United States, 527 U.S. 1 (1999), however, the Supreme Court clarified the analysis that is appropriate where an improper jury instruction essentially removes an element of the offense from the jury's consideration. That is precisely what happened here, because the Pinkerton instruction allowed the jury to convict without determining whether Williams possessed the firearm. It matters not whether we characterize the error here as a misdescription of the element of possession or as

an omission of it, because Neder recognized that "[i]n both cases--misdescriptions and omissions-- the erroneous instruction precludes the jury from making a finding on the actual element of the offense." Id. at 10; see also Lanier v. United States, 205 F.3d 958, 963-64 (7th Cir. 2000). The Neder Court held that the harmless error rules apply to such a situation, and that the conviction can be upheld only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. Neder, 527 U.S. at 18. The only element of the felon-in-possession statute that was at issue in the trial was the element of possession. Our inquiry, then, is whether it is clear beyond a reasonable doubt that a rational jury would have found that Williams actually or constructively possessed the firearm.

We have scoured the trial for any evidence relating to the firearm, and it is minimal indeed. The government introduced testimony that the firearm was found in a dresser drawer in the one bedroom of the apartment that appeared to be used by adults. The government also introduced a picture of the firearm as it sat in the drawer. The picture appeared to show a pair of boxer shorts and either a tie or a scarf, depending upon who was interpreting it, in the drawer next to the firearm. Williams introduced evidence that Samuel Simmons, son of Daisy Walls, shared the apartment with her. She also introduced the testimony of her mother who said that she herself had never seen the gun before, and that Williams was afraid of guns and "wouldn't have that." We must decide whether there is any reasonable doubt that a jury would find actual or constructive possession on that evidence.

There is absolutely no evidence that Williams ever had physical control over the gun, and thus actual possession is not a possibility. The government nevertheless argues that she had constructive possession of it. We note that on this issue, too, a jury instruction was problematic. The jury was instructed only that

Possession may be actual or constructive. Constructive possession as used in these instructions is the ability to control cocaine or a gun.

Constructive possession, however, exists only if a defendant "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." [emphasis added] United States v. Garrett, 903 F.2d 1105, 1110 (7th Cir. 1990). Citing Garrett, Williams tendered a jury instruction that essentially recited the Garrett

definition verbatim, but the court chose not to provide it. Instead, it provided the above instruction, which was a pattern jury instruction for 21 U.S.C. sec. 841 violations (since changed to explicitly require knowledge and intent) but which could be interpreted as requiring only the power to exercise control. An identical instruction to the one given here was challenged in United States v. Boykins, 9 F.3d 1278, 1287 (7th Cir. 1993), on the basis that it failed to inform the jury that intent was an essential element of constructive possession. We upheld the instruction in that case because other instructions included the language that the defendant must knowingly have both the power and intention to exercise dominion and control. Id. That additional language was not present here, however, and the instruction failed to adequately apprise the jury of the need to find intent. Like the Pinkerton error, however, this leads us back to the same harmless error analysis. We must determine whether there is any reasonable doubt that a rational jury would have found constructive possession here.

If the question before us were one of sufficiency of the evidence, there is no doubt whatsoever that the evidence sufficed to demonstrate constructive possession. We have held that constructive possession may be established by a showing that the firearm was seized at the defendant's residence. United States v. Kitchen, 57 F.3d 516, 521 (7th Cir. 1995). See also United States v. Richardson, 208 F.3d 626, 632 (7th Cir. 2000) (substantial connection to the residence sufficient); United States v. Booth, 111 F.3d 1, 2 (1st Cir. 1997) (knowledge of the firearm in some circumstances can be inferred from control of the area). A jury could infer that Williams had both knowledge of the firearm and an intent to exercise dominion and control over it merely from its presence in the bedroom that she apparently shared with Samuel Simmons. Moreover, constructive possession may be joint, and thus the possibility that Simmons had control over the firearm as well would not preclude a finding of constructive possession by Williams. Kitchen, 57 F.3d at 521. That said, we cannot hold that the evidence of her knowledge and intent was so overwhelming that no rational jury would find otherwise. The firearm was found in a dresser drawer that arguably contained only men's clothing in a bedroom shared by Samuel Simmons, son of codefendant Daisy Walls. No evidence was introduced that linked Williams to that firearm. For instance, no testimony was introduced that the gun was ever displayed in Williams' presence or that she ever mentioned its existence, and no fingerprint or other evidence tied her to it. Although it is of slight value, Williams' mother

testified that Williams was afraid of guns and would not have one. A rational jury could be left with a reasonable doubt as to whether Williams knew of the firearm or intended to exercise dominion or control over it. Neder, 527 U.S. at 19. Therefore, under the standard set forth in Neder, we must reverse the sec. 922(g)(1) conviction and remand for a new trial on that count.

C.

The remaining issues are unavailing, and will be addressed only briefly. Williams challenges a jury instruction that was endorsed by this court in United States v. Osmani, 20 F.3d 266 (7th Cir. 1994), and she has provided no compelling reason for revisiting that decision. In addition, she asserts that the trial court erred in sustaining objections to some testimony designed to incriminate Wall's son. Williams identifies with particularity only a few objections in the transcript, and has provided only the cursory conclusion that the court's ruling was an abuse of discretion. Therefore, Williams has arguably waived this argument. Our perusal of the transcript pages that she did identify, however, reveals no reversible error. Similarly, Williams' general challenges to the sufficiency of the evidence are without merit, as there was ample evidence to support the jury's conclusions.

Finally, Williams cannot succeed on her claim that her sentence should be reduced because she was only a minor participant. A defendant is entitled to a two-level reduction as a minor participant if she can show that she was "less culpable than most other participants." U.S.S.G. sec. 3B1.2(b), comment (n.3). That reduction is designed to mitigate the effect of the relevant conduct assessment to the extent that a defendant's sentence reflects conduct other than her own. Thus, the proper inquiry under sec. 3B1.2 is whether the defendant was a minor participant in the offense for which she was convicted, not whether she was a minor participant in a larger conspiracy above and beyond the conduct for which she is being held accountable. See United States v. Mojica, 185 F.3d 780, 791 (7th Cir. 1999) and cases cited therein. Here, Williams was held accountable only for the amount of drugs she actually carried to her house. Therefore, she did not play a minor role with respect to the conduct for which she is being held accountable. See United States v. Burnett, 66 F.3d 137, 140 (7th Cir. 1995) ("When a courier is held accountable for only the amounts he carries, he plays a significant rather than a minor role in that offense.").

IV.

 Accordingly, we affirm the convictions and sentences for Daisy Walls and Sharee S. Williams on the counts of conspiracy to possess with intent to distribute and conspiracy to distribute substances containing cocaine in violation of 21 U.S.C. sec. 846, and possession with intent to distribute approximately four kilograms of cocaine in violation of 21 U.S.C. sec. 841(a)(1). We reverse the conviction of Williams for knowingly possessing a firearm as a felon in violation of 18 U.S.C. sec. 922(g)(1), and remand for a new trial on that count.