In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 01-3752 and 01-4130

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID H. BRUMFIELD and LUIS L. PENA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 00 CR 118—**Barbara B. Crabb**, *Chief Judge.*

ARGUED MAY 15, 2002—DECIDED JULY 29, 2002

Before FLAUM, *Chief Judge,* and BAUER and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* A grand jury indicted David Brumfield and Luis Pena, among others, for involvement in a cocaine trafficking operation located in Dane County, Wisconsin. Mr. Brumfield ultimately reached an agreement with prosecutors and pleaded guilty to one count of distributing cocaine in violation of 21 U.S.C. § 841. The district court sentenced him to 137 months of imprisonment. Through separate negotiations, Mr. Pena also reached an agreement with the Government and pleaded guilty to one count of conspiring to possess with intent to distribute

a controlled substance in violation of 21 U.S.C. § 846. The district court sentenced Mr. Pena to 151 months of imprisonment. In this consolidated appeal, both defendants raise challenges to their respective sentences. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

Between 1999 and 2000, a joint task force comprised of local, state and federal law enforcement personnel uncovered a drug trafficking organization centered around Wisconsin resident Carol Armstrong. More precisely, Armstrong distributed large quantities of cocaine with the assistance of friends and family members from her residence in Dane County, Wisconsin. According to investigators, Armstrong's associates in this enterprise included Mr. Pena, who was her common-law husband, and Mr. Brumfield, a family friend. Law enforcement personnel ultimately moved to halt the operation and eventually arrested, among others, Mr. Brumfield, Mr. Pena and Armstrong.

On February 22, 2001, a grand jury returned a multicount superceding indictment against the members of Armstrong's organization, including Mr. Brumfield and Mr. Pena.[1] The indictment alleged that, on three separate occasions, Mr. Brumfield had violated 21 U.S.C. § 841(a)(1).

---

[1] On December 20, 2000, the grand jury had returned an indictment against Mr. Brumfield, Patricia Waldrop and Armstrong. Returned on February 22, 2001, the superceding indictment added new defendants, including Mr. Pena, and new charges to the case.

In addition, the grand jury charged Mr. Brumfield as well as Mr. Pena with one count of conspiring to possess with intent to distribute a controlled substance, cocaine, in violation of 21 U.S.C. § 846.

## A. Mr. Brumfield

On July 18, 2001, under the terms of a written plea agreement, Mr. Brumfield pleaded guilty to one count of distributing cocaine in violation of 21 U.S.C. § 841(a)(1). In turn, the Government dismissed the remaining counts of the indictment against Mr. Brumfield. The terms of the plea agreement, however, stated: "The defendant understands that all relevant conduct as defined in U.S.S.G. § 1B1.3 will be considered by the sentencing judge in determining the appropriate guideline range and resulting sentence." R.115 at 2.

Soon after, a federal probation officer prepared a Presentence Investigation Report ("PSR"), documenting Mr. Brumfield's involvement in the Armstrong organization. According to the PSR, during different periods of 2000, Mr. Brumfield had agreed to distribute cocaine in the Madison, Wisconsin, area with Armstrong and other individuals. Specifically, from April through early August 2000, and again during the months of November and December 2000, Mr. Brumfield actively participated in this endeavor.[2] The PSR recommended holding Mr. Brumfield accountable for 42 grams of cocaine that one of his confederates, Patricia Waldrop, had sold to a confidential informant

---

[2] Armstrong pushed Mr. Brumfield out of the conspiracy at some point during the summer of 2000. Mr. Brumfield, however, began to sell drugs on behalf of Armstrong again during November 2000.

prior to August 2000. The document also advised that the court attribute to Mr. Brumfield roughly 1.1 kilograms of cocaine that Armstrong had sold or had arranged to sell to a government agent during November and December 2000. The PSR also noted that other members of the Armstrong organization had made numerous drug sales to informants between the months of August and December. The parole officer recommended averaging these drug sales "and attributing two months worth to Brumfield," yielding roughly an additional 92 grams of cocaine. Brumfield PSR ¶ 28. Finally, statements from Waldrop indicated that Mr. Brumfield dealt roughly one-half ounce of cocaine a day between April and mid-July 2000, producing another 1.3 kilograms of cocaine for which Mr. Brumfield was responsible. Totaling these quantities with sales Mr. Brumfield himself had made to government informants, the PSR recommended holding him accountable for 2.59 to 2.68 kilograms of cocaine.[3] In reaching this conclusion, the PSR not only cited U.S.S.G. § 1B1.3, the entire relevant conduct guideline, but also quoted language from one specific subdivision of this provision, U.S.S.G. § 1B1.3(a)(1)(B).

On October 11, 2001, Mr. Brumfield appeared before the district court for his sentencing hearing. Through counsel, Mr. Brumfield renewed previous objections that he had made concerning the PSR's relevant conduct analysis. In particular, Mr. Brumfield challenged the reliability of Waldrop's statements concerning the span over which she observed him deal cocaine. In addition, he submitted that,

---

[3] The PSR initially recommended holding Mr. Brumfield accountable for between 2.723 and 2.758 kilograms of cocaine. However, when certain mathematical errors were brought to the attention of the probation officer, the drug amount was corrected.

upon renewing his association with Armstrong in No-
vember 2000, he lacked knowledge as to the scope of her
drug enterprise. To bolster these contentions, Mr. Brumfield
had Armstrong testify on his behalf during the sentenc-
ing hearing. During her testimony before the district court,
Armstrong stated that Mr. Brumfield never sold cocaine
on her behalf and that she, in fact, would not trust him to
do so. Indeed, the witness proceeded to exculpate sev-
eral additional members of her organization, including
Mr. Pena and her children. Finally, in his closing remarks
to the district court, Mr. Brumfield's counsel stated that,
based upon his reading of the PSR, his client could only be
held accountable for drug quantities within the ambit of
U.S.S.G. § 1B1.3(a)(1)(B), the relevant conduct provision
specifically quoted in the PSR.

In response to Mr. Brumfield's contentions concerning
Patricia Waldrop, the Government called her to testify dur-
ing the sentencing hearing. On direct examination, Waldrop
reiterated her previous statements that, between April
and mid-July 2000, she observed Mr. Brumfield deal one-
half ounce of cocaine per day. However, when pressed
on cross-examination concerning the date on which she
first met Mr. Brumfield, Waldrop conceded that, although,
to the best of her recollection, she met Mr. Brumfield
in April, it was possible that she, in fact, met him in early
May.

After considering the testimony and the parties' conten-
tions, the district court adopted the guideline calculation
set forth in the PSR and held Mr. Brumfield accountable
for between 2.54 and 2.64 kilograms of cocaine.[4] In reach-

---

[4] This estimate is slightly less than that set forth in the PSR even
though the district court indicated that it adopted the calcula-
(continued...)

ing this conclusion, the district court discounted Armstrong's testimony, finding it "truly ludicrous." R.200 at 51. Rather, the district court emphasized that:

> I just don't believe there's any basis on which to find that he wouldn't have been aware of the scope of the activity in which Ms. Armstrong and the others were engaged. I also find plenty of evidence to support the fact that he was very much a part of that activity. His own statements and Ms. Waldrop's statements make that clear.

R.200 at 52. On this basis and invoking U.S.S.G. § 1B1.3(a)(2)[5] of the relevant conduct provision, the district court stated that, "[i]n calculating the offense conduct, I

---

[4] (...continued)
tions set forth in that document. The district court reached its estimate based on: 1.3 kilograms that Mr. Brumfield sold in the presence of Waldrop, 35 to 70 grams Mr. Brumfield sold to a confidential informant, 134.8 grams his confederates sold to the same informant and 1.1 kilograms of cocaine Armstrong had sold or had arranged to sell to an informant during November and December 2000.

[5] U.S.S.G. § 1B1.3(a)(2) provides that "solely with respect to offenses of a character which § 3D1.2(d) would require grouping of multiple counts, [an individual is accountable for] all acts and omissions described in subdivisions (1)(A) and (1)(B) [of the relevant conduct provision] that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). This provision references U.S.S.G. § 1B1.3(a)(1)(B), which provides "in the case of a jointly undertaken criminal activity (or a criminal plan, scheme, endeavor or enterprise undertaken in concert with others, whether or not charged as a conspiracy), [an individual is accountable for] all reasonably foreseeable acts and omissions in furtherance of the jointly undertaken activity." U.S.S.G. § 1B1.3(a)(1)(B).

am holding you accountable for all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." R.200 at 56. Coupling his base offense level with his criminal history category of VI, Mr. Brumfield confronted a sentencing range of 110 to 137 months of imprisonment. The district court imposed a 137-month sentence, finding that Mr. Brumfield posed a danger to the community.

### B.  Mr. Pena

During the summer of 2001, Mr. Pena reached a written plea agreement with the Government; he agreed to waive indictment and to plead guilty to a one-count criminal information filed with the district court on August 31, 2001. In particular, the information charged Mr. Pena with conspiring to possess with intent to distribute, and to distribute, cocaine in violation of 21 U.S.C. § 846. In addition, under the terms of the agreement, the Government undertook "to recommend that the defendant's relevant conduct involved between 300 and 400 grams of cocaine." R.135 at 2. This drug quantity reflected the amount of cocaine that Mr. Pena personally had handled.

Prior to sentencing, a probation officer prepared a PSR in Mr. Pena's case. The PSR recommended holding Mr. Pena accountable for 403 grams of cocaine; it also concluded that "[t]here is no information which suggests the defendant had either an aggravating role or mitigating role during his involvement in the offense." Pena PSR ¶ 64. Soon after, Mr. Pena, through counsel, challenged not only the calculation of drug quantity but also the decision recommending against a downward adjustment in his offense level. In particular, Mr. Pena submitted that he was entitled to a reduction in his base offense level because he

played only a minimal or minor role in the offense within the meaning of U.S.S.G. § 3B1.2. Mr. Pena emphasized that he merely acted as a substitute, reluctantly distributing cocaine on Armstrong's behalf when she and other members of the organization were away from her residence. In addition, citing his age of sixty-one, his poor health and vulnerability to Armstrong, Mr. Pena also submitted that he was entitled to a downward departure from the applicable sentencing range.

Although recognizing that Mr. Pena should only be held accountable for 302 grams of cocaine, an addendum to the PSR rejected his remaining contentions. In particular, the addendum concluded that an adjustment under U.S.S.G. § 3B1.2 was unwarranted because he had been held accountable only for the drugs that he personally had handled. The document also dismissed Mr. Pena's request for a downward departure.

During the sentencing hearing, Mr. Pena renewed his contentions concerning his request not only for an adjustment under U.S.S.G. § 3B1.2 but also for a downward departure based on his age, health and vulnerability to Armstrong. To bolster these contentions, Mr. Pena submitted testimony from a psychologist as well as his own stepdaughter. The psychologist, in particular, emphasized that Mr. Pena lacked good decision-making skills and easily could be influenced by others; however, he conceded that Mr. Pena could differentiate right from wrong.

After considering the parties' positions, the district court rejected Mr. Pena's request for an adjustment or downward departure. In the district court's view, Mr. Pena had made a conscious choice to assist Armstrong in her endeavor. The district court also adopted the guideline calculation contained in the PSR, thereby accepting the addendum's drug quantity calculation of 302 grams. Mr. Pena's status

as a career offender coupled with a criminal history category of VI yielded a sentencing range of 151 to 188 months of imprisonment. The district court imposed a sentence of 151 months of imprisonment.

## II

## DISCUSSION

### A. Standard of Review

We review the district court's legal interpretation of the Sentencing Guidelines de novo. *See United States v. Wilson*, 98 F.3d 281, 282 (7th Cir. 1996). We employ the same standard when considering constitutional challenges to a sentencing scheme. *See United States v. Turner*, 93 F.3d 276, 286 (7th Cir. 1996). However, we review the factual determinations of the sentencing court only for clear error. *See United States v. Nunez*, 958 F.2d 196, 198 (7th Cir. 1992). Consequently, we shall reverse the factual findings of the district court only if, "after reviewing the entire record, we are left with the firm and definite conviction that a mistake has been made." *United States v. Corral-Ibarra*, 25 F.3d 430, 437 (7th Cir. 1994). Moreover, in reviewing the factual findings of the district court, we are mindful that, during sentencing, the Government must prove the facts underlying a sentencing adjustment only by a preponderance of the evidence. *See United States v. Smith*, 210 F.3d 760, 762 (7th Cir. 2000).

### B. Mr. Brumfield's Sentence

On appeal, Mr. Brumfield raises multiple challenges to the district court's sentencing determination. First, in Mr. Brumfield's estimation, he received no notice that the district court would rely upon U.S.S.G. § 1B1.3(a)(2) of

the relevant conduct provision in calculating his sentence. In the alternative, Mr. Brumfield submits that, even if he received adequate notice, the district court erred in its factual determinations concerning the drug quantity for which he should be held accountable. Finally, relying on the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Mr. Brumfield argues that the sentencing proceedings denied him various constitutional rights. We shall address each of these contentions.

### 1.

As a threshold matter, the parties dispute whether Mr. Brumfield received notice that his base offense level would be calculated in light of U.S.S.G. § 1B1.3(a)(2) of the relevant conduct provision. Principles of due process require that a defendant receive notice of, and an opportunity to respond to, factors relied upon in his sentencing. *See United States v. Pandiello*, 184 F.3d 682, 686 (7th Cir. 1999). Federal Rule of Criminal Procedure 32, the provision governing sentencing procedures, "provides for focused, adversarial development of the factual and legal issues relevant to determining the appropriate Guidelines sentence." *Burns v. United States*, 501 U.S. 129, 134 (1991). To achieve this goal, the parties, particularly the defendant, must have notice of the factual and legal issues that the district court will consider in making its sentencing determination. *See United States v. Thomas*, 969 F.2d 352, 356 (7th Cir. 1992). Thus, Rule 32 "implies that a defendant must have notice of the sentencing adjustments at issue and the government's basis for requesting them." *Pandiello*, 184 F.3d at 686.

After reviewing the record and considering the parties' oral arguments, we conclude that Mr. Brumfield had sufficient notice of the provision's applicability to afford

meaningful adversarial testing of the district court's sentencing determination. First, we note that the PSR adequately apprised Mr. Brumfield of the facts underlying the district court's relevant conduct inquiry. In particular, through its seven-paragraph "Relevant Conduct Analysis," the PSR set forth in detail the evidentiary basis of its drug quantity calculation. Thus, prior to the sentencing hearing, Mr. Brumfield was afforded substantial notice of the factual issues that would frame the district court's sentencing determination.

We are equally confident that Mr. Brumfield received notice concerning the legal issues that would influence his sentence. Through his plea agreement, Mr. Brumfield acknowledged that the district court would consider "all relevant conduct as defined in U.S.S.G. 1B1.3" in determining his sentence. R.115 at 2. Indeed, as this court has noted, "[t]he sentencing court is required to consider such relevant conduct when calculating the defendant's base offense level in order to determine the Guidelines range." *Thomas*, 969 F.2d at 355.

The PSR was not precise in one respect. Although stating that "U.S.S.G. § 1B1.3 indicates the offense level should be determined based on all relevant conduct," the PSR proceeded to quote only from U.S.S.G. § 1B1.3(a)(1)—one of the subdivisions of the relevant conduct guideline. Brumfield PSR ¶ 26. During the sentencing proceeding, Mr. Brumfield's counsel seized on this ambiguity and objected to any sentencing determination based on U.S.S.G. § 1B1.3(a)(2). However, in articulating his objection, counsel merely asserted that, based on his reading of the PSR, Mr. Brumfield could not be held accountable for relevant conduct within the ambit of § 1B1.3(a)(2). He provided no indication that he had been surprised by the reliance on this relevant conduct subdivision in calculating his client's

sentence. Indeed, an examination of the entire sentenc-
ing proceeding, including the written objections to the
PSR by Mr. Brumfield, makes clear that the defense was
under no misapprehension about the scope of the judicial
inquiry into Mr. Brumfield's relevant conduct. Notably,
counsel did not even seek a continuance to better respond
to this line of analysis. *Cf. Pandiello*, 184 F.3d at 687. Indeed,
during oral argument before this court, Mr. Brumfield's
counsel candidly admitted that he had anticipated the
Government's reliance on this provision and, as such,
was prepared to respond. Given these circumstances, we
cannot accept Mr. Brumfield's contention of inadequate
notice.

### 2.

We next address Mr. Brumfield's remaining conten-
tions concerning the district court's calculation of drug
quantity. In particular, he submits that the district court
based its calculation on unreliable evidence, namely the
testimony of Patricia Waldrop. Moreover, Mr. Brumfield
challenges the district court's decision to hold him account-
able for certain drug sales attributable to other members
of the Armstrong organization.

### a.

Based on the testimony of Patricia Waldrop, the dis-
trict court concluded that Mr. Brumfield dealt one-half
ounce of cocaine per day between April and mid-July 2000,
rendering him accountable for distributing roughly 1.3
kilograms of this drug. Mr. Brumfield contests the reliability
of this calculation, emphasizing not only equivocations
in Waldrop's testimony as to when she met him but also

the witness' history of drug abuse. More precisely, Mr. Brumfield submits that, given these circumstances, the district court was required to subject Waldrop's testimony to heightened scrutiny.

Although we review deferentially a district court's factual findings concerning drug quantity, we must be mindful of a defendant's due process right to be sentenced on the basis of reliable information. *See United States v. Galbraith*, 200 F.3d 1006, 1011 (7th Cir. 2000); *United States v. Lanterman*, 76 F.3d 158, 160 (7th Cir. 1996). Because of this reliability concern, we have instructed district courts to scrutinize more carefully certain types of evidence offered at sentencing hearings. *See United States v. Beler*, 20 F.3d 1428, 1434-37 (7th Cir. 1994). In particular, when a witness plagued by a history of drug abuse offers testimony marked by blatant and material inconsistencies, we expect a sentencing court to engage in a more searching analysis of this evidence. *See United States v. Robbins*, 197 F.3d 829, 849-50 (7th Cir. 1999). At the same time, though, the mere fact an individual has a poor memory or history of drug abuse does not prohibit consideration of her testimony. *See United States v. McEntire*, 153 F.3d 424, 436 (7th Cir. 1998). Simply put, so long as the facts "bear sufficient indicia of reliability to support their probable accuracy, the court may consider them in sentencing." *Lanterman*, 76 F.3d at 161.

Although Waldrop's testimony contained some equivocations, we cannot conclude that the ambiguities rendered this evidence so unreliable as to preclude the district court's considering it in calculating Mr. Brumfield's sentence. During direct examination, the Government inquired when Ms. Waldrop first met Mr. Brumfield. She responded: "approximately April of 2000." Brumfield Sentencing Tr. at 27. She offered a similar reply when asked to approximate the date on which she moved into the Armstrong

home with Mr. Brumfield. On cross-examination, however, Waldrop conceded that it was possible she had not only met, but also moved in with, Mr. Brumfield during May 2000. However, upon further questioning by defense counsel, Waldrop reiterated that, to the best of her recollection, she first met Mr. Brumfield in April, not May. In sum, although this testimony indicates Waldrop could not remember the precise date on which she met Mr. Brumfield, her statements are not marked by blatant inconsistencies rendering them unreliable. Simply put, the district court had to make the type of routine credibility determination inherent in the fact-finding process. After having heard Waldrop's testimony and observed her demeanor, the district court was entitled to accept the witness' clarification of her testimony and conclude that she met Mr. Brumfield in April, not May. *See United States v. Torres-Ramirez*, 213 F.3d 978, 980 (7th Cir. 2000) ("When the sentence rests on testimony under oath, however, it is enough that the judge believe the witness—unless the testimony is illogical or contradicted by documents or other physical evidence, making it clearly erroneous to accept the witness's version of events.").

### b.

Mr. Brumfield also alleges that the district court erred in holding him accountable for certain drug sales attributable to members of the Armstrong organization. In particular, he submits that, upon renewing his involvement with Armstrong in November 2000, he lacked knowledge as to the precise scope of her operations. As such, he contends that he could not reasonably foresee the drug sales made by Armstrong or her associates.

The Sentencing Guidelines instruct that, when a defendant is involved in a jointly undertaken criminal activity, he

is accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). A jointly undertaken criminal activity includes "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3(a)(1)(B) cmt. n.2. Standing alone, the existence of a jointly undertaken criminal activity does not render a defendant accountable for the drug sales of other members of the concerted activity. Rather, the court must also assess the reasonable foreseeability of this conduct, inquiring into the scope of the criminal activity the defendant agreed to undertake jointly. *See United States v. Booker*, 248 F.3d 683, 688 (7th Cir. 2001); *United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir. 1993) ("Reasonable foreseeability refers to the scope of the agreement [the defendant] entered into when he joined [the enterprise], not merely to the drugs he may have known about."). Thus, "the conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision." U.S.S.G. § 1B1.3(a)(1)(B) cmt. n.2.

In this case, the PSR, which the district court adopted, unequivocally stated that Mr. Brumfield "agreed to work with Armstrong and others involved to distribute cocaine in the Madison [, Wisconsin,] area." Brumfield PSR ¶ 27. From April until mid-July, Mr. Brumfield resided at the Armstrong residence, the location from which the organization distributed many of its drugs. Moreover, during this period, he, along with Waldrop and Armstrong's son, frequently delivered cocaine to clients and also made deliveries for Armstrong. Although seemingly acknowledging these facts, Mr. Brumfield asserts that, upon renewing his association with Armstrong in November 2000, he had not sub-

stantially committed himself to her enterprise. However, as the district court recognized, Mr. Brumfield's statements to an undercover officer during November 2000 belies his contention. During November 2000, Mr. Brumfield discussed the fact that "they" had to move cocaine from the Armstrong residence because it was "hot." Brumfield PSR Addendum at 2. In addition, Mr. Brumfield also informed the undercover agent of a new telephone number at which he could be reached because Armstrong and her associates believed that the Government had tapped the phone lines at her residence. These statements indicate that Mr. Brumfield possessed inside information concerning the organization, information that reveals he was connected with their endeavor during November and December 2000. Based on these facts, the district court did not commit clear error in holding Mr. Brumfield accountable for drugs attributable to other members of the organization, including the 1.1 kilograms of cocaine attributable to Armstrong.

In addition, Mr. Brumfield contends that the district court employed an unreliable methodology in holding him accountable for certain sales other members of the Armstrong organization made to a confidential government informant. In particular, from August until December 2000, other members of the enterprise sold various quantities of cocaine to a single government informant. To account for Mr. Brumfield's absence from the organization during some of this period, the PSR averaged these drug sales from August to December. It then held Mr. Brumfield accountable for two months' worth of sales, approximately 90 grams of cocaine, reflecting his reentry into the conspiracy during November and December 2000. Although the PSR did not attempt to discern whether drug sales were lighter during November and December, we do not require perfect calculations of drug quantity. Rather, "estimates of drug

quantity are acceptable if they are based on evidence possessing a sufficient indicia of reliability and not nebulous eyeballing." *United States v. Durham*, 211 F.3d 437, 444 (7th Cir. 2000). The methodology employed by the district court did not run afoul of this reliability requirement.[6]

### 3.

Finally, relying on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Mr. Brumfield contends that, in conducting its relevant conduct inquiry, the district court erred in holding him accountable for drug quantities that were not submitted to a jury and proved beyond a reasonable doubt. However, as Mr. Brumfield candidly acknowledges, our well-settled interpretation of *Apprendi* forecloses this argument in his case. We have repeatedly stated that, so long as the defendant's sentence does not exceed the statutory maximum prescribed by the statute of conviction, "*Apprendi* does not create [for the defendant] a right to jury determination of the drug quantity." *United States v. Parker*, 245 F.3d

---

[6] Mr. Brumfield also contests being held accountable for 42 grams of cocaine that Waldrop sold to an informant prior to August 2000. As Mr. Brumfield notes, the PSR does not delineate when precisely before August the fifteen sales involved in this calculation occurred. Mr. Brumfield contends that, because he left the organization in mid-July 2000, it would be improper to hold him accountable for sales that may have occurred after his departure from the conspiracy. We do not believe that the district court committed clear error in considering this amount. However, excluding these sales from the calculation would not affect Mr. Brumfield's sentencing range. Mr. Brumfield's conduct would still warrant a base offense level of 28 because he would remain accountable for more than 2 kilograms but less than 3.5 kilograms of cocaine.

974, 977 (7th Cir. 2001); *Talbott v. Indiana*, 226 F.3d 866, 869 (7th Cir. 2000); *cf. Harris v. United States*, No. 00-10666, 2002 WL 1357277, at *11 (U.S. June 24, 2002) ("Yet once the jury finds all those facts [charged in the indictment], *Apprendi* says that the defendant has been convicted of the crime; the Fifth and Sixth Amendments have been observed; and the Government has been authorized to impose any sentence below the maximum."); *United States v. Watts*, 256 F.3d 630, 634-35 (7th Cir. 2001) (rejecting applicability of *Apprendi* to mandatory minimum sentences). Simply put, "*Apprendi* does not affect application of the relevant-conduct rules under the Sentencing Guidelines to sentences that fall within a statutory cap." *Talbott*, 226 F.3d at 869. In this case, Mr. Brumfield acknowledges that his sentence of 137 months of imprisonment falls well below the statutory maximum prescribed in 21 U.S.C. § 841. Accordingly, we must reject his contention that this sentence violates the mandates of *Apprendi*.

### C.  Mr. Pena's Sentence

Mr. Pena submits that the district court erred in declining to grant his motion for a minor or minimal role reduction pursuant to U.S.S.G. § 3B1.2. Under this guideline provision, a district court may reduce a defendant's base offense level provided that the defendant was either a "minimal" or "minor participant in any criminal activity." U.S.S.G. § 3B1.2(a) (4-level reduction for minimal participation) & § 3B1.2(b) (2-level reduction for minor participation). We note that the determination as to whether a defendant warrants this adjustment depends heavily upon the particular facts of the case before the district court. *See United States v. Montenegro*, 231 F.3d 389, 395 (7th Cir. 2000). Moreover, our case law makes clear that a sentencing court will grant this adjustment infrequently. *See United States v. Crowley*, 285 F.3d 553, 559 (7th Cir. 2002); *see also*

U.S.S.G. § 3B1.2 cmt. n.2 ("It is intended that the downward adjustment for a minimal participant will be used infrequently.").

Mr. Pena first contends that the district court failed to address adequately his motion for an adjustment. In particular, Mr. Pena contends that the district court failed to make any factual findings on his motion for an adjustment under U.S.S.G. §§ 3B1.2(a) and (b). Upon examination of the record, we note that the district court did not undertake, on an independent basis, an exhaustive oral or written examination of this particular motion. Rather, the court simply denied the request for a downward adjustment. However, during the sentencing hearing, the district court adopted the sentencing recommendation set forth in the PSR and its addendum. These documents squarely addressed Mr. Pena's arguments concerning U.S.S.G. §§ 3B1.2(a) and (b), and concluded that no grounds existed for an adjustment in this case. As we have noted on many occasions, it is permissible for a district court to discharge its obligation to make factual findings by adopting the contents and analysis of the PSR. *See United States v. Parolin*, 239 F.3d 922, 925 (7th Cir. 2001); *United States v. Taylor*, 135 F.3d 478, 483 (7th Cir. 1998). "The reference to the findings and rationale in the presentence report allows us, as a reviewing court, to evaluate the district court's decision, and that is all that is required." *Taylor*, 135 F.3d at 483. Accordingly, this portion of Mr. Pena's claim is without merit.

Moreover, upon reviewing Mr. Pena's substantive contention concerning the merits of the adjustment, we must affirm the district court's calculation of his sentence. U.S.S.G. § 3B1.2 serves to offset the otherwise harsh results that might flow from the mechanical application of the relevant conduct provision of the Sentencing Guidelines. *See United States v. Walls*, 225 F.3d 858, 868 (7th Cir. 2000).

Accordingly, "the proper inquiry under § 3B1.2 is whether the defendant was a minor [or minimal] participant in the offense for which she was convicted, not whether she was a minor [or minimal] participant in a larger conspiracy above and beyond the conduct for which she is being held accountable." *Walls*, 225 F.3d at 868. In this vein, we have found no error in a district court's denial of this adjustment when a defendant has been held accountable only for the drugs that he handled personally. *See Crowley*, 285 F.3d at 560; *United States v. Perez*, 249 F.3d 583, 584 (7th Cir. 2001); *Walls*, 225 F.3d at 868. In this case, through his plea agreement with the Government, Mr. Pena was held accountable only for the cocaine that he personally distributed. As our case law recognizes, it would be incongruous to find that Mr. Pena functioned as a minimal or minor participant with regard to conduct in which he personally was involved. As such, we find no error in the district court's sentencing determination concerning Mr. Pena.

## Conclusion

We conclude that the district court properly calculated the respective sentences of Mr. Brumfield and Mr. Pena. Therefore, we affirm the sentencing determinations of the district court.

AFFIRMED

A true Copy:

     Teste:

               _____
               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*