In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-2095, 10-2817

TIMOTHY L. HARNEY and
PATRICIA A. MULDOON,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO and
OFFICER JOSEPH MIDONA,

*Defendants-Appellees,*

and

PAMELA DEVARELA,

*Defendant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-02814—**Joan Humphrey Lefkow**, *Judge.*

ARGUED JUNE 1, 2011—DECIDED DECEMBER 10, 2012

Before FLAUM and SYKES, *Circuit Judges*, and CONLEY,
*District Judge.*[*]

---

[*] The Honorable William M. Conley, United States District
Court for the Western District of Wisconsin, sitting by designa-
tion.

CONLEY, *District Judge.* Plaintiffs Timothy L. Harney and Patricia A. Muldoon brought this civil action against the City of Chicago and one of its police officers, Joseph Midona, pursuant to 42 U.S.C. § 1983, alleging that defendant Midona entered their residence and arrested them without a warrant or probable cause in violation of the Fourth Amendment of the United States Constitution. The district court granted summary judgment to defendants on all claims. Agreeing that there are no genuine issues of material fact or legal grounds on which plaintiffs are entitled to proceed, we affirm that court's grant of summary judgment. The following facts are taken from the undisputed findings submitted to the district court, viewing the facts in a light most favorable to defendants and drawing all reasonable inferences in their favor.

## I.

### A. The Parties

Harney and Muldoon are married and occupy one unit of a three-unit condominium building in Chicago, Illinois. Pamela DeVarela occupies one of the other two units.[1] This lawsuit developed out of a history of contentious interactions between these neighbors and

---

[1] Plaintiffs also alleged state law claims against DeVarela. In granting summary judgment to defendants the City of Chicago and Midona on the federal claims, the district court opted not to exercise its supplemental jurisdiction and dismissed the state law claims without prejudice. DeVarela is not a party to the appeal.

the involvement of defendant Midona in this spat be-
tween neighbors.

### B. History of Strained Relations

In April 2004, DeVarela contacted the Chicago Police
Department to complain about damage to a mirror on
her vehicle. Officer Midona was dispatched to respond to
her complaint. Although DeVarela had no proof, she
claimed that the damage was caused by Harney and
Muldoon. Lacking any evidence of the identity of
the offender, Midona's police report indicated that the
damage was caused by an "unknown offender." At this
time, Midona also apparently gave DeVarela his personal
cell phone number in the event of any further incidents.

On September 21, 2004, DeVarela's dog bit Harney.
Harney reported the incident to the City of Chicago and
obtained medical treatment for the dog bite.

A couple days later, DeVarela telephoned Officer Midona
on his cell phone, requesting that he prepare a second
police report. This time DeVarela reported that on Septem-
ber 21, 2004, Harney and Muldoon chased her up the stairs
and pushed her as she tried to enter her unit's door.

### C. Events Leading Up To Plaintiffs' Arrests

On May 16, 2005, DeVarela again called Midona to
complain about damage to her vehicle. The next day,
Midona and Sergeant Woznicki met with DeVarela and
were shown a videotape consisting of clips DeVarela

compiled from two separate videotapes.[2] In her summary judgment opinion, the district judge aptly described the clips as follows:

> The first clip, on March 6, 2005, depicts a man, identified as Harney, performing a series of tasks. Harney first examines his car's rear left tire, then briefly stops at DeVarela's car's rear left tire before squatting by her rear right tire and fiddling with it. He returns to his rear left tire, performs some work on it, and then turns to look at DeVarela's front left tire. After some time passes, Harney pulls his car partially out of the garage, changes the rear left tire, and drives away.
>
> . . .
>
> The second clip, on March 26, 2005, depicts a woman, identified as Muldoon, moving around the garage. Muldoon closes the garage door and walks past the rear of DeVarela's car with an object in her right hand. She then turns around, walking back toward her own car, with her right arm at her side, her wrist turned away from her body. Once she passes DeVarela's car, she turns her wrist over. She then opens the garage door and walks out.

(App. 3.)

Midona testified at his deposition that the first clip showed Harney removing the valve cap from DeVarela's

---

[2] Harney and Muldoon raise evidentiary objections to these videotapes that are addressed below.

tire, letting out the air and putting the cap on his own car. Midona acknowledged, however, that he could not actually see Harney take the valve cap off or even see the valve cap, but he believed the video corroborated DeVarela's claim that Harney had let the air out of her tire and taken the valve cap.

As for the second clip, Midona described the video as showing Muldoon walking behind DeVarela's car, scratching the back of the vehicle with some object, then opening the garage door again and leaving. He testified at his deposition that he heard a scratching noise on the tape. DeVarela also showed Midona and Woznicki the damage to her car that she believed Muldoon had caused. Midona observed a long scratch along the back of the car, although he did not recall at the time of his deposition whether it was on the trunk or the bumper.

DeVarela told Midona and Woznicki that she wanted to press charges. Woznicki advised her to first obtain an estimate of the cost of repairing her car and then contact the police. DeVarela obtained an estimate that same day.

The next day, on May 18, 2005, Midona received another call from DeVarela. Midona then went to the condominium building with detectives Kurt Kourakis and Gloria Ekerman, who had been assigned to investigate. The detectives went to DeVarela's unit to talk with her. While DeVarela gave Kourakis her account of how her vehicle had been damaged, DeVarela's roommate showed Ekerman the video clips. DeVarela later played

the same video for Kourakis, identifying the people on the videotape were Harney and Muldoon. Kourakis later testified about the contents of the video he viewed, which was consistent with the district court's description above.

DeVarela then provided the detectives with this "compilation" video as well as the repair estimate for her car. After finishing with DeVarela, the detectives went with Midona to arrest Harney and Muldoon.

### D. The Arrests and Prosecution

Harney contends that he heard someone ring the doorbell. The record is unclear as to the location of the doorbell, but giving plaintiffs the benefit of any doubt, we will assume it was located outside of the front walkway of the condominium building rather than directly outside of Harney and Muldoon's particular unit.[3]

In response to the doorbell, Harney exited his condominium unit and saw the officers inside the gate on the front walkway to the condominium building.

Once Harney stepped outside his unit, Midona advised that he was under arrest and that there was a videotape

---

[3] The record also does not reveal when or how the officers entered the condominium building itself, although it is only reasonable to assume that DeVarela had already let them in or, at the very least, had given them implicit permission for them to enter common areas having just visited her condominium unit in the same building.

of him letting air out of DeVarela's tire. Midona also asked to speak with Muldoon, informing Harney that there was also a videotape of Muldoon keying DeVarela's car. Harney told the officers that Muldoon had been injured and was in bed.

While still outside of his unit, Harney told the officers that he would go get Muldoon. The officers followed Harney into the unit. Harney did not invite the officers in, but he also did not instruct them to remain outside or tell them that he would be right back. The record does not reveal whether the door had closed prior to the officers entering the unit or if they slipped in behind Harney prior to the door closing.[4]

The officers walked about eight to ten feet into the unit to the kitchen. Harney went to the bedroom to tell Muldoon that the police wanted to speak with her about keying DeVarela's car. While Harney was speaking with Muldoon, the officers instructed Harney and Muldoon that they needed to come out of the bedroom. Harney had not heard the officers enter behind him and did not know that they were in the unit until he was instructed to leave the bedroom. Even so, neither Harney nor Muldoon objected to the officers' presence in their home.

Harney and Muldoon came out of the bedroom, and Muldoon was informed that she was under arrest. Harney and Muldoon then followed the officers outside of the

---

[4] Harney did not attempt to close the door behind him, although it closes automatically.

condominium building and were taken to the police station. Harney was charged with misdemeanor theft; Muldoon was charged with felony property damage. Both trials were to the bench. In both, the trial judge directed a finding of not guilty, concluding that the videotape evidence did not prove guilt beyond a reasonable doubt.

### E.  District Court Proceedings

Harney and Muldoon then filed the present lawsuit, alleging violations of § 1983 against Midona and the City of Chicago and state law claims against DeVarela. The district court granted summary judgment to Midona and the City of Chicago as to all claims. The court found that qualified immunity shielded Midona as to plaintiffs' false arrest claims. As for plaintiffs' unlawful arrest claims, the court concluded that Harney was arrested in public and that the officers had implied consent to enter Harney and Muldoon's condominium unit to arrest Muldoon. The court's grant of summary judgment to Midona mooted plaintiffs' indemnification claim against the City of Chicago.

### II.

The court reviews the district court's decision to grant summary judgment to defendants *de novo* and may affirm on any basis supported by the record and law. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 681 (7th Cir. 2007). In addition to the appeal of the district court's

grant of summary judgment, appellants also raise an evidentiary challenge to the district court's considera- tion of certain videotapes at summary judgment. The court reviews this challenge for abuse of discretion. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 475 (7th Cir. 2010). The court also reviews for abuse of discretion the district court's awarding of costs to defendants. *See U.S. Neurosurgical, Inc. v. City of Chi.*, 572 F.3d 325, 333 (7th Cir. 2009).

### A. Evidentiary Issue Concerning Videotapes

Midona produced two videotapes in support of his motion for summary judgment. Plaintiffs contend that these videotapes are not the ones Midona viewed on May 18, 2005. Rather, Midona viewed the compilation video that DeVarela claims to have created from the two separate videotapes submitted at summary judgment.

Harney and Muldoon fail to substantiate their sug- gestion that Midona did not view the portions of the video clips relevant to this lawsuit. As explained in the district court's opinion, while the videotapes submitted in support of summary judgment contain footage *not* contained in the compilation video, and therefore Midona did not view the entirety of the footage sub- mitted at summary judgment, there is no dispute that Midona viewed the portions of the tape relevant to the court's determination of whether probable cause existed. (App. 9 n.6.) The content of the videotape—what Midona saw and how he interpreted it—is material to whether probable cause existed, not the format of the

content absent some substantiated claim that the excerpted video clips had been tampered. Accordingly, the district court did not abuse its discretion in considering these videotapes in its discussion of plaintiffs' false arrest claims.

For the first time on appeal, plaintiffs also argue that the videotapes cannot be produced in an admissible form. "In granting summary judgment, the court may consider any evidence that would be admissible at trial. The evidence need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content." *Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002) (internal citation omitted). Even though defendants were apparently unable to produce the original or copy of the compilation video Midona viewed prior to Harney's and Muldoon's arrests, Midona himself was competent to testify as to the portions of the two original videotapes he viewed prior to their arrests. *See* Fed. R. Evid. 1004 (allowing for admissibility of other evidence of content).[5]

---

[5] Here, the original videotapes are at least arguably *better* evidence, because it is in unaltered form, limiting defendants to justify the arrests based on *actual* conduct rather than some excerpted clips taken out of context, unless plaintiffs' theory is that DeVarela excerpted clips that were *more* favorable to defendants than the original.

### B.  False Arrest Claim

Turning to the merits of Harney and Muldoon's claim that they were falsely arrested, plaintiffs must demonstrate that Midona lacked probable cause to arrest them. *See Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011). "Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, [to believe] . . . that the suspect has committed, is committing, or is about to commit an offense.'" *Mucha*, 650 F.3d at 1056 (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). Probable cause does not require that the existence of criminal activity is more likely true than not, rather (true to its label) probable cause simply requires "a probability or substantial chance of criminal activity exists." *Mucha*, 650 F.3d at 1056-57 (citing *Purvis v. Oest*, 614 F.3d 713, 722-23 (7th Cir. 2010); *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007)).

Moreover, the court's inquiry is limited to what the officer knew at the time of the arrest and not what has been gained from hindsight. *Mucha*, 650 F.3d at 1057. The court considers the evidence from the "perspective of a reasonable person in the position of the officer." *Mucha*, 650 F.3d at 1057 (citing *Gonzalez*, 578 F.3d at 537).

Here, Midona had ample reason to find probable cause for Harney's and Muldoon's arrests. Initially, Midona relied on DeVarela's complaint, namely her statement that air had been released from her tire while located in a closed garage to which only a few,

including defendants, had access and that the back of her car had been scratched, along with Midona's own visual inspection of the car.[6] Importantly, the history of tension between the neighbors did not require Midona to disregard DeVarela's complaint. *See Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 2000) ("While the lengthy and ongoing dispute culminating in the altercation and the other charges Cherny had filed might tend to establish Cherny's bias, these facts do not render Cherny's report incredible as a matter of law."); *Guzell v. Hiller*, 223 F.3d 518, 519-20 (7th Cir. 2000) ("Police are entitled to base an arrest on a citizen complaint, whether of a victim (as here) or a nonvictim witness, without

---

[6] The parties dispute whether DeVarela signed a complaint before or after plaintiffs' arrest. Viewing the facts in the light most favorable to plaintiffs, the district court correctly assumed the complaint was not signed until after Harney and Muldoon were arrested. (App. 8.) As a result of this finding, the district court concluded that it could not rely on DeVarela's complaint to support a finding of probable cause. There is no dispute, however, that Midona spoke with DeVarela prior to the arrests. The district court does not cite a case, nor could this court find one, supporting the district court's assumption that a formal, written statement is required to constitute a victim complaint sufficient to support a finding of probable cause. *See Bledsoe v. City of Chi.*, No. 96-2815, 1997 WL 374808, at *2 (7th Cir. June 24, 1997) (unpublished) (finding probable cause based on "oral complaint" of victim and dismissing § 1983 false arrest claim). What matters is what the officer knew at the time of the arrest—regardless of whether that information came from an oral statement or a formal written complaint.

investigating the truthfulness of the complaint, un-less—this turns out to be an important qualification—they have reason to believe it's fishy."); *Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988) ("We are not unaware that a person who dislikes another has a motive to lie to the detriment of that person, but motive without at least a shred of evidence suggesting that the motive was acted on does not taint a statement.").

Even if Midona's reliance on DeVarela's complaint was somehow questionable, the videotape obviated any taint from the complaint. The videotape shows Harney bending down to examine DeVarela's tire and shows Muldoon walking past DeVarela's car with keys in her hand. While far from definitive proof, these video clips substantiate motive (Harney's own deflated tire), opportunity (Harney's and Muldoon's uninterrupted access to DeVarela's car) and means (Harney's unex-plained, prolonged inspection of DeVarela's tire).

The district court concluded that fact issues as to what the videotape actually depicts precluded a finding that Midona had probable cause to arrest as a matter of law. (App. 10.) Still, the district court granted summary judgment to defendants, finding qualified immunity shielded Midona from liability. In so holding, the court concluded that a reasonable officer *could* have believed that the arrests were lawful. (*Id.* at 14.) Arguably at least this is all that probable cause itself requires—namely, a showing that "a prudent person, or one of reasonable caution" with the officer's knowledge at the time of the arrest believed that the suspect committed an offense.

*Mucha*, 650 F.3d at 1056. As the district court apparently held, a good faith defense arguably requires something even less than probable cause—that is, a good faith belief that there is a basis to believe. Since the undisputed facts meet the burden of probable cause, this court need not attempt to discern any differences on a good faith standard.

Here, plaintiffs Harney and Muldoon failed to put forth evidence to create a genuine issue of material fact as to whether Midona lacked probable cause at the time of their arrests. Contrary to plaintiffs' apparent position, the fact that the state trial judge decided the video-tape evidence was insufficient to find either Harney or Midona guilty beyond a reasonable doubt does not undercut the finding of probable cause for the arrests. *Scruggs v. United States*, 929 F.2d 305, 307 (7th Cir. 1991) ("Acquittal does not establish the lack of probable cause[.]"). Moreover, though not required, the fact that Midona undertook to engage two detectives in further investigation and the decision to arrest undermines any argument of even subjective bad faith here. The court, therefore, affirms the grant of summary judgment as to this claim, albeit on a different basis than that relied on by the district court.

### C. Unlawful Arrest Claims

In addition to the false arrest claim, Harney and Muldoon also challenge the lawfulness of their arrests without a warrant, but for divergent reasons.

### 1. Harney's Arrest

"[P]olice officers may constitutionally arrest an individual in a public place (e.g., outside) without a warrant, if they have probable cause." *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001). Harney contends that he was arrested in the curtilage of his condo and, therefore, his warrantless arrest was in violation of his rights under the Fourth Amendment. The "curtilage" has been described by this court as the area "so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home." *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002). In *United States v. Dunn*, 480 U.S. 294, 300-01 (1987), the United States Supreme Court described four factors to be considered in determining whether an area constitutes the curtilage of a home:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

It is undisputed that Harney's arrest occurred in the walkway outside of the condominium building, but inside of a gate.[7] While the proximity of the area of

---

[7] While the district court stated in its opinion that it was unclear whether the arrest occurred inside or outside of the gate (App. 11), the parties both represent in their briefs to this

(continued...)

Harney's arrest to the condominium building and the fact that it occurred behind a gate may support a finding that this area fell within the curtilage of a the condominium building, the record contains no photographs or detailed descriptions of the area from which a fact finder could determine whether the gate created a barrier, shielding the area from public view. This is plaintiffs' burden. *See Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007) (explaining that the burden of establishing a claimed invasion of the curtilage is on the party asserting a Fourth Amendment violation). A plaintiff must begin to meet this burden by submitting admissible, supporting evidence in response to a proper motion for summary judgment. *See Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011).

More critically, the record *does* reveal that the area of Harney's arrest was in an area shared by all of the tenants of the condominium building. Absent certain particular facts not alleged here, there is no reasonable expectation of privacy in common areas of multiple dwelling buildings. *See, e.g.*, *United States v. Villegas*, 495 F.3d 761, 767-68 (7th Cir. 2007) (finding no reasonable expectation of privacy in the common hallway of a

---

[7] (...continued)

court that the arrest occurred inside the gate. To the extent a dispute remains, it is, as the district court also found, immaterial. An arrest outside of the gate is plainly in public, requiring no warrant. Plaintiffs' claim, therefore, turns on the lawfulness of an arrest occurring inside of the gate to the condominium building property.

duplex building); *United States v. Espinoza*, 256 F.3d 718, 723 (7th Cir. 2001) (noting that tenants in a multi-family building lack a reasonable expectation of privacy in common areas of the building); *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991) (holding that the defendant lacked a reasonable expectation of privacy in an apartment building's common entrance).

Moreover, the fact that a gate barred—to some unknown extent—public viewing or access does not create a reasonable expectation of privacy in common or shared areas. *See United States v. Nettles*, 175 F. Supp. 2d 1089, 1093 (N.D. Ill. 2001) ("Generally speaking, there is no reasonable expectation of privacy in common or shared areas of multiple dwelling buildings. This is so even where the common areas are otherwise locked to exclude persons that are not tenants of the buildings." (citations omitted)). Indeed as noted, the record at least suggests, if not definitively establishes, that the officers were invited into this area by plaintiffs' co-tenant DeVarela in the course of their investigation.

Having failed to put forth sufficient evidence from which a reasonable jury could find that the area of Harney's arrest constituted the curtilage of the condominium building, plaintiffs have not established Midona was required to have a warrant to arrest Harney. Accordingly, the court affirms the district court's grant of summary judgment to defendants on Harney's claim of unreasonable arrest.

### 2. Muldoon's Arrest

"A warrantless entry into a residence to effect an arrest is presumptively unreasonable under the Fourth Amendment." *United States v. Walls*, 225 F.3d 858, 862 (7th Cir. 2000). Where someone with the authority to do so gives consent to enter, however, the entry is reasonable and not in violation of the Fourth Amendment. *Id.* Moreover, consent may be manifested in a non-verbal manner. *Id.* For example, this court, on more than one occasion, has found that the act of opening a door and stepping back to allow entry is sufficient to demonstrate consent. *See, e.g., Walls,* 225 F.3d at 862-63; *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 690 (7th Cir. 2001).

Plaintiffs cite to *Hadley v. Williams*, 368 F.3d 747 (7th Cir. 2004), for support that Midona lacked consent to enter. In *Hadley*, the court concluded that "[t]he consent of Hadley's mother was procured by an outright and material lie, and was therefore ineffectual." 368 F.3d at 749. Recognizing that *Hadley* is clearly distinguishable on its facts from those here, plaintiffs instead point to the court's recognition that "[t]he fact that a person answers a knock at the door doesn't mean that he agrees to let the person who knocked enter." *Id.* at 750. But this, too, does not reflect the situation Midona and his fellow officers encountered.

Instead, Midona followed Harney into his and Muldoon's condominium unit after Harney informed them that he would go and get Muldoon from their bedroom. As the district court recognized, this situation closely mirrors the facts in *Gerald M. v. Conneely*, 858

F.2d 378, 384 (7th Cir. 1988). In *Gerald M.*, Officer Conneely knocked on the door and asked to speak with Mrs. Macek's sons. 858 F.2d at 384. "Mrs. Macek states that when the officer came to the door and asked to speak to her sons, she agreed to call them up from the basement, but she instructed Officer Conneely to 'wait here.'" *Id.* As Mrs. Macek went to get the boys, Officer Conneely entered the home and proceeded down the hallway to the kitchen, following Mrs. Macek's path. *Id.* Mrs. Macek stated in her deposition that she was "surprised" by Officer Conneely's presence in her home, but "did nothing to indicate to him that she disapproved." *Id.*

The court held that, while Mrs. Macek's instruction to the officer to "'wait here' . . . give[s] us pause," "[h]er subsequent silence and apparent acquiescence persuades us that Conneely's presence in the home was not against Mrs. Macek's apparent wishes." *Id.* at 384-85. Relying on the undisputed fact that Mrs. Macek did not "verbally object" or "physically respond in any way that might relay the message she disapproved of his movement," the court found Mrs. Macek's simple surprise at Officer Conneely's presence "falls well short of demonstrating that under the totality of the circumstances her consent was not voluntary." *Id.* at 385.

The facts at issue here present a far easier question than that posed in *Gerald M.* Before going into his condominium, Harney was informed that he was under arrest and that the officers intended to place Muldoon under arrest. Most likely, Harney did not ask Midona and the other officers to wait outside of the condominium

unit because he understood (or should have understood) that, having himself been arrested, he was not free to go *anywhere* without the officers accompanying him or, at least, consenting to his doing so without them. In any event, Harney simply told them that he would go and get Muldoon out of the bedroom. Further, like in *Gerald M.*, the fact that neither Harney nor Muldoon objected to the officers' presence in their condominium unit or otherwise indicated that they had not consented to their presence provides additional support that Harney implicitly consented to the officers' entry. *See also Walls*, 225 F.3d at 863 ("Her consent is further illustrated by her actions after they entered the residence in motioning for them to follow her to the kitchen where she could speak with them privately.").[8]

Even if the court were to find consent lacking, plaintiffs fail to demonstrate—and cannot demonstrate in light of this court's holding in *Gerald M.*—that Officer Midona's following of his prisoner Harney into his apartment was unreasonable, much less a clearly established violation of the Fourth Amendment. *See Sparing*, 266 F.3d 684, 691 (finding officers entitled to qualified immunity because the law surrounding "doorway arrests" was not clearly established at the time of the arrest).

---

[8] In their reply brief, plaintiffs appear to argue that the only way Muldoon and Harney could have objected to the officers' presence was by physically resisting arrest, which is a violation of Illinois state law. (Reply Br. 21.) But nothing would have prevented Harney and Muldoon from voicing an objection to the officers' presence in their home.

Indeed, this court's holding in *Gerald M.* would undermine any sense of "fair warning" to Officer Midona that his conduct was unlawful. *Wheeler v. Lawson*, 539 F.3d 629, 640 (7th Cir. 2008) (describing policy underlying qualified immunity). As such, even construing the facts in the light most favorable to plaintiffs, Midona would still be entitled to qualified immunity.

### E.  Challenges to Award of Costs

Under Federal Rule of Civil Procedure 54(d)(1), a prevailing party is entitled to recover "[c]osts other than attorneys' fees . . . as of course." Among the costs a court may tax are: "(1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; [and] (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920.

Plaintiffs challenge the district court's award of costs pursuant to 28 U.S.C. § 1920 in four respects, three of which warrant little discussion. Dealing with those three first—the district court's award of (1) costs for binding deposition transcripts; (2) so-called "excessive" costs for transferring VHS tapes to DVDs and duplicating the DVDs; and (3) $529 for copies of Midona's cell phone records—the court agrees that plaintiffs have failed to demonstrate that these costs are unreasonable or otherwise contrary to the Judicial Conference policy since all fall within allowable categories of expenses. *See*

*Beamon v. Marshall & Isley Trust Co.*, 411 F.3d 854, 864 (7th Cir. 2005) (noting that the losing party has the burden of demonstrating that taxed costs are not appropriate).

Plaintiffs also challenge the district courts award of $475.00 for court reporter "appearance fees" in addition to the per page transcript fee. The parties agree that the Northern District of Illinois Local Rule 54.1 governs the award of transcription costs. It provides in pertinent part:

> **(b) Transcript Costs.** Subject to the provisions of Fed.R.Civ.P. 54(d), the expense of any prevailing party in necessarily obtaining all or any part of a transcript for use in a case, for purposes of a new trial, or amended findings, or for appeal shall be taxable as costs against the adverse party. If in taxing costs the clerk finds that a transcript or deposition was necessarily obtained, *the costs of the transcript or deposition shall not exceed the regular copy rate as established by the Judicial Conference of the United States* and in effect at the time the transcript or deposition was filed unless some other rate was previously provided for by order of court. Except as otherwise ordered by the court, only the cost of the original of such transcript or deposition together with the cost of one copy each where needed by counsel and, for depositions, the copy provided to the court shall be allowed.

(Emphasis added.) Plaintiffs argue that defendants are entitled to $3.65 per page—the regular copy rate established by the Judicial Conference of the United States. In

addition to this amount, the district court also awarded appearance fees which exceed the per page allowable amount and which plaintiffs contend are contrary to the plain language of Rule 54.1.

In *Extra Equipmentos E Exportacao v. Case Corp.*, 541 F.3d 719, 727 (7th Cir. 2008), we affirmed the district court's award of attendance fees, holding that "the separate attendance fee is properly regarded as a component of the fee for the transcript." *See also Held v. Held*, 137 F.3d 998, 1002 (7th Cir. 1998) ("[W]e have previously held that even though [deposition attendance fees] are not specifically mentioned in the statute, the district court may award them in its discretion pursuant to 28 U.S.C. § 1920(2)."). This holding does not fully resolve the issue posed here—namely, whether the local rule's limit on the per page reimbursement includes appearance fees. Indeed, there appears to be a split among the district judges in the Northern District of Illinois, with some judges awarding appearance fees in addition to the maximum allowable per page transcript fee and other district courts limiting the taxable costs to the per page rate. *Compare Dishman v. Cleary*, 279 F.R.D. 460, 467 (N.D. Ill 2012) (Denlow, M.J.); *Comrie v. IPSCO Inc.*, No. 08-3060, 2010 WL 5014380, at *3 (N.D. Ill. Dec. 1, 2010) (Darrow, J.); *Wagner v. University of Illinois Medical Center*, No. 09 C 7591, 2010 WL 4074376, at *1 (N.D. Ill. Oct. 12, 2010) (Conlon, J.), *with Serwatka v. City of Chi.*, No. 08 C 5616, 2011 WL 2038725, at *1 (N.D. Ill. May 24, 2011) (Feinerman, J.); *Perry v. City of Chi.*, No. 08-4730, 2011 WL 612342, at *5 (N.D. Ill. Feb. 15, 2011) (Schenkier, M.J.);

*Fletcher v. Chi. Rail Link, LLC*, No. 06 C 842, 2007 WL 4557816, at *1 (N.D. Ill. Dec. 20, 2007) (Kennelly, J.).

Some of the district courts awarding appearance fees above the per page rate point to this court's award of appearance fees in addition to the maximum allowable rate in *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 457 (7th Cir. 1998). While in *Cengr*, the court awarded a per page transcription costs and "court reporter services" fees, there is no indication in the opinion that the losing party raised a challenge or the court even considered whether an award of appearance fees would result in a per page amount exceeding the maximum allowed under Local Rule 54.1. Certainly, the plain language of Local Rule 54.1 does not appear to support awarding appearance fees where the total award would exceed the allowable per page amount, but similarly, the rule does not expressly preclude such an award rather than addling the prevailing party with this cost. Since this issue arises solely out of the application of the district court's own local rule and would appear best addressed by an amendment of that rule clarifying the availability of court reporter appearance fees over and above the allowable per page amount, *and* since it would appear plaintiffs fail to address this issue at all in their reply brief, the issue will be deemed waived here.

The judgment of the district court is therefore AFFIRMED.