In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-1020

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HUAZHI HAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cr-00388 — **Andrea R. Wood**, *Judge.*

ARGUED MAY 20, 2024 — DECIDED JUNE 28, 2024

Before FLAUM, BRENNAN, and KOLAR, *Circuit Judges.*

FLAUM, *Circuit Judge.* A jury convicted Huazhi Han on money laundering and related charges after he used his electronic goods business to launder drug proceeds for Mexican drug traffickers. Han now argues that he is entitled to a new trial, challenging the district court's denial of his motion to suppress, admission of threat evidence, and denial of his motion for a mistrial based on the government's closing argument. Finding no error, we affirm.

## I.    Background

### A.  Factual Background

In 2017, the Drug Enforcement Administration (DEA) and Chicago Police Department (CPD) began investigating a money laundering organization in Chicago. Han played a key role in that organization.

On at least eight occasions in the summer and fall of 2017, Rafiq Roman, a drug trafficker, delivered cash proceeds from his kilogram-quantity cocaine dealing to Han. Each delivery followed the same script. Once Roman collected over $100,000, he contacted "Tio"—his Mexico-based drug source—who provided the phone number for an individual identified as "Sam"—actually Han—and a dollar bill serial number. Roman would then call Sam, verifying his identity using the serial number, to arrange a cash transfer.

In November 2017, officers arrested Roman, and he agreed to cooperate. He contacted Tio and, as before, Tio gave Roman a serial number and Sam's phone number. Roman, in turn, called the number and arranged for a meeting the next day. With DEA agents and CPD officers surveilling, Roman delivered $100,000 in lookalike currency to Han. Soon after, the officers stopped and arrested Han, finding a loaded firearm, approximately $200,000 in cash, and the lookalike currency in his car.

With Han detained, several officers went to his home. A security camera at Han's residence captured most, but not all, of what happened next. Two CPD officers—Jennifer Przybylo and Carlos Huertas—approached Han's front door, knocking loudly, and ringing the doorbell. Han's wife, Jing Wang, came to the door but did not immediately open it. When Przybylo

asked Wang to open the door, she did. Przybylo and Huertas stepped through the open doorway, remaining at the entry as they spoke to Wang.

The officers told Wang that her husband was in custody, and that he had agreed to let them search the house. (As the district court later found, Han did not consent to the search.) Then, there is a 24-second gap in the footage. According to Przybylo, the missing footage showed her explaining that Han was okay, but that police found a gun and large sum of money when they arrested him. The video resumes with Przybylo telling Wang that they need to confirm there are not guns in the home because guns could be "very dangerous for [Wang's] baby." Huertas then asked Wang, "Do you want to grab the baby," to which Wang responded, "No, he's sleeping."

After this exchange, there is another gap in the recording, this time two minutes long. Przybylo maintains that, during the gap, she asked Wang for verbal consent to search the home and Wang agreed. After the second gap, the recording captured Wang telling Przybylo that her "English is not very well [sic]," and Przybylo responding, "That's okay."

Huertas soon moved past Wang into the living room, asking Wang to show him where the baby slept. Przybylo added, "Yeah, show us where he sleeps, okay? We want to make sure there's no more guns there." Huertas, Przybylo, and Wang then walked out of the video frame followed by several other officers.

Roughly thirty minutes into the search, Przybylo asked Wang to sign a written consent form, and she complied. Toward the end of the search, one of the DEA agents informed

Wang that her vehicle would be seized in connection with the investigation. But Wang pushed back, explaining that she needed the car to pick her older son up from school, and the officers acquiesced.

Ultimately, the officers recovered nearly $1.3 million in cash, a money counter, rubber bands, and firearms from Han's home. However, Han was not charged with a crime. Instead, he was released, and the investigation continued.

Han kept laundering money, this time with Jason Mei. On several occasions in the spring of 2018, Mei picked up drug proceeds from unknown individuals and delivered them to Han, giving him directions to wire equivalent amounts of money to various Chinese bank accounts.

In June 2018, police arrested Mei and he also agreed to cooperate. Under police surveillance, Mei met with Han to arrange dropping off drug proceeds to clean. This discussion triggered Han to transfer money to Chinese bank accounts in anticipation of the exchange. When Mei did not immediately deliver the cash, Han sent threatening messages and even visited Mei's home. Eventually, Mei delivered $192,000 to Han. After the hand-off, officers stopped Han, seizing the cash from his vehicle.

### B. Procedural Background

A grand jury subsequently indicted Han on four charges: (1) conspiracy to commit money laundering, 18 U.S.C. § 1956(h); (2) money laundering by concealment, 18 U.S.C. § 1956(a)(1)(B)(i); (3) conducting a financial transaction represented to involve proceeds from unlawful activity, 18 U.S.C. § 1956(a)(3)(B); and (4) operating an unlicensed money transmitting business, 18 U.S.C. § 1960(a).

Before trial, Han moved to suppress the evidence seized from the November 2017 search, arguing that the officers searched his home without a warrant or consent. After an evidentiary hearing, the district court denied the motion. While the district court found that Han did not voluntarily consent to the search, it determined, under the totality of the circumstances, that Wang did.

The case then proceeded to a jury trial in March 2022. Over several weeks, the government called more than a dozen witnesses, including Roman, Mei, and the officers involved in the investigation. Two issues from trial are relevant on appeal. First, during Mei's testimony, the district court admitted, over Han's objection, evidence that Han threatened Mei and his family. Second, during closing arguments, the government referenced Han's inability to identify certain text message recipients.

The jury convicted Han on all counts and this appeal followed.

## II.    Discussion

Han makes three challenges on appeal. He contends that the district court erred when (1) denying his motion to suppress, (2) admitting the threat evidence, and (3) denying his motion for a mistrial based on the government's closing remarks. We take each in turn.

### A.  Motion to Suppress

"When reviewing a district court's denial of a motion to suppress, we review the court's legal conclusions de novo and its factual findings for clear error." *United States v. Jones*, 22 F.4th 667, 673 (7th Cir. 2022).

"Consent is a well-recognized exception to the Fourth Amendment's warrant requirement" that "[t]he prosecution bears the burden of proving" was "freely and voluntarily given." *Id.* at 675–76 (citation and internal quotation marks omitted). Han does not dispute that Wang, "a co-resident in the shared home, had authority to give consent to the … search[]." *United States v. Davis*, 44 F.4th 685, 688 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 1758 (2023); *see also United States v. Terry*, 915 F.3d 1141, 1145 (7th Cir. 2019). Nor does he contest that Wang consented. Instead, he argues that Wang's consent was not voluntary, necessitating suppression of the fruits of the search.

"Whether consent was voluntary is a factual determination reviewed for clear error." *Jones*, 22 F.4th at 675. In assessing voluntariness, courts look to the totality of the circumstances, including "(1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent." *United States v. Ambriz-Villa*, 28 F.4th 786, 790 (7th Cir. 2022) (quoting *United States v. Figueroa-Espana*, 511 F.3d 696, 704–05 (7th Cir. 2007)). "No single factor controls." *Jones*, 22 F.4th at 676.

As the district court found, several factors weigh in favor of voluntariness. Wang is 40 years old and attended college in the United States. She was not in custody or detained, consenting soon after opening the door and almost immediately upon the officers' request. Moreover, while Wang was not informed of her constitutional right to refuse consent, it is

undisputed that the officers did not use or threaten the use of physical force; as the district court noted, they spoke in conversational tones throughout the interaction. And, despite Wang's assertion that her English is limited, she effectively communicated with the officers during the search, pushing back on their attempt to seize her car and request to bring her sleeping child downstairs. Viewing these factors in the totality of the circumstances, we do not think that the district court clearly erred when finding that they tip the scales in favor of voluntary consent.

Nonetheless, Han presses that Wang did not voluntarily consent because the officers (1) indicated that Han had already consented, (2) suggested that guns in the home posed a threat to Wang's child, and (3) stepped inside the house before obtaining Wang's consent.

According to Han, Przybylo's false statement that Han consented to the search suggested that the officers could search the home without Wang's consent. An improper claim of police authority can weigh against a finding of voluntariness, but it is not determinative. *United States v. McGraw*, 571 F.3d 624, 629–30 (7th Cir. 2009). For example, in *McGraw*, officers implied that they had the right to search a defendant's home without his permission or a warrant because it was condemned. *Id.* at 626–27, 629. We nonetheless affirmed the district court's conclusion that the defendant voluntarily consented in light of the totality of the circumstances. *Id* at 629–30. In other instances, such as when officers falsely assert that they have a valid warrant, a false claim of authority is harder to overcome. *See United States v. Nafzger*, 965 F.2d 213, 216–17 (7th Cir. 1992) (concluding that evidence should have been suppressed when a defendant consented only after police

confronted him with a defective warrant); *Hadley v. Williams*, 368 F.3d 747, 748–49 (7th Cir. 2004) (reasoning that consent was not voluntary where the defendant's mother agreed to let police enter only if they had a warrant and the officer falsely responded, "Yes, we've got everything we need. It's all covered."). This case is more like *McGraw* than the warrant cases. While a warrant—defective or not—communicates that a person cannot refuse a search, the officers' misleading statement here did not. Wang could still refuse the search even if Han had consented. *See Georgia v. Randolph*, 547 U.S. 103, 122–23 (2006) (explaining that a physically present inhabitant can refuse a police search regardless of the consent of a fellow occupant). And like *McGraw*, the totality of the circumstances, including Wang's calm cooperation and conduct, otherwise indicate voluntary consent despite the officers' misleading statement.

The officers' statements about the danger posed by guns in the house did not render Wang's consent involuntary either. "[T]he law permits the police to pressure and cajole, conceal material facts, and actively mislead." *Hadley*, 368 F.3d at 749 (citation omitted). That cajoling may have upset Wang or made her fearful, but we do not think the district court clearly erred in finding that it was not coercive. *See, e.g.*, *United States v. Stone*, 471 F.2d 170, 173 (7th Cir. 1972) (concluding that consent was voluntary even where the consenting party was upset); *United States v. Martin*, 761 F.2d 426, 434 (7th Cir. 1985) (same). The officers did not physically coerce Wang, nor did they threaten her or her child. *See United States v. Groves*, 470 F.3d 311, 317, 322 (7th Cir. 2006) (explaining that "[a]ny level of threats or coercion," such as officer's threats that he would physically remove the defendant's girlfriend's child from the home, "would weigh against a finding of voluntariness").

Instead, they permissibly pressured her to consent by appealing to her child's safety.

Finally, Han contends that Wang did not voluntarily consent to the officers' initial entry into the home. Recall, when Wang answered the door, Przybylo and Huertas crossed the threshold before she explicitly consented to the search. According to Han, this entry violated the Fourth Amendment.

While "answer[ing] a knock at the door" is not enough, *Hadley*, 368 F.3d at 750, a person may impliedly consent by "opening a door and stepping back to allow entry," *United States v. Sabo*, 724 F.3d 891, 894 (7th Cir. 2013) (quoting *Harney v. City of Chicago*, 702 F.3d 916, 925 (7th Cir. 2012); *see also Gerald M. v. Conneely*, 858 F.2d 378, 384–85 (7th Cir. 1988) (explaining that an officer could reasonably assume consent where the person answering the door said to "wait here," but did not "verbally object," "act astonished," or "physically respond in any way that" relayed disapproval when the officer entered anyway). Like in *Sabo* and *Conneely*, the record supports that Wang impliedly consented to the initial entry. Przybylo knocked, identified herself as police, and asked Wang to open the door. When Wang complied, Przybylo and Huertas stepped through the doorway, remaining by the door until Wang explicitly consented to the search. Importantly, Wang did not object to their entry or otherwise indicate that they should remain outside. Thus, we are not left with the firm and definite conviction that the district court erred when finding that the officers' intrusion into the threshold, without Wang's objection, did not contravene the Fourth Amendment.

Under the totality of the circumstances, we cannot say that a mistake has been made. Reasonable minds may disagree,

but the district court's finding that Wang voluntarily consented to the search was not clearly erroneous.

**B. Threat Evidence**

Next, Han argues that the district court erred by admitting evidence that he threatened Mei after Mei did not deliver the drug proceeds as planned. "We review challenges to the district court's evidentiary rulings for an abuse of discretion." *United States v. Howard*, 692 F.3d 697, 703 (7th Cir. 2012). We reverse "only where no reasonable person could take the view adopted by the trial court." *Id.* (citation omitted).

According to Han, the district court should have excluded the threat evidence as improper propensity evidence under Federal Rule of Evidence 404(b). "Rule 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts for the purpose of proving a person's character or propensity to behave in a certain way, but permits the use of this evidence for other [enumerated] purposes." *United States v. Gomez*, 763 F.3d 845, 852 (7th Cir. 2014) (en banc); Fed. R. Evid. 404(b).

Importantly, Rule 404(b) only curtails the introduction of "evidence of *other* acts." *United States v. Thomas*, 986 F.3d 723, 728 (7th Cir. 2021) (emphasis added). "'Direct evidence of a crime is almost always admissible against a defendant' and is not 'other act evidence.'" *Id.* (quoting *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010)). For example, "evidence of [the defendant's] role in the charged conspiracy [is] not propensity evidence." *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010). Neither are actions "taken for the purpose of thwarting discovery of the crime or postponing the investigation of the crime." *United States v. Bowling*, 952 F.3d 861, 869 (7th Cir. 2020). That includes "attempts to threaten witnesses,

potential witnesses, or people cooperating with a government investigation of the charged conduct." *United States v. Jackson*, 70 F.4th 1005, 1014 (7th Cir. 2023). Ultimately, if the evidence is "part and parcel of the circumstances surrounding the conspiracy crimes with which [the] [d]efendant[] w[as] charged," Rule 404(b) is inapplicable. *United States v. Cardena*, 842 F.3d 959, 983 (7th Cir. 2016).

The district court viewed the threats as direct evidence of actions Han took in furtherance of the conspiracy and thus did not implicate Rule 404(b). When denying Han's renewed motion for a new trial on this ground, the district court emphasized that the threat evidence was "relevant and probative evidence reflecting Han's knowledge that the funds he expected Mei to deliver to him were the proceeds of some unlawful activity." They were "part and parcel" of the conspiracy itself. *Id*.

Han presses a different view of the evidence on appeal. He suggests that it shows that he is violent, and a violent person may threaten associates in legitimate business activities. True as that may be, the evidence is also relevant and probative of money laundering: Han made the threats while money laundering to keep control of a money laundering exchange. *Cf. United States v. Jackson*, 898 F.3d 760, 765 (7th Cir. 2018) (explaining that threats were relevant to show how a defendant kept control of heroin distribution network).

Since Han resorted to threats rather than going to the police or courts to force Mei to pay, the evidence is also relevant and probative to the inference that Han was engaged in illegal activity rather than legal electronic goods sales. And, by threatening Mei—a witness and cooperator—mere months after his initial arrest for money laundering, this conduct

could be construed as conduct to thwart discovery of the conspiracy. *See Jackson*, 70 F.4th at 1013–14. Accordingly, we do not think that the district court abused its discretion when admitting the threat evidence as direct evidence of Han's crimes.

Even if evidence does not implicate Rule 404(b), a "district court may still choose to exclude relevant direct evidence under Rule 403," *United States v. Ferrell*, 816 F.3d 433, 443 (7th Cir. 2015), "if its probative value is substantially outweighed by … [the risk of] unfair prejudice," Fed. R. Evid. 403. On that score, Han contends that the threat evidence is unfairly prejudicial, and the district court did not clearly articulate its Rule 403 rationale.

"Although the district court did not explicitly engage in [Rule 403] balancing, implicit in its description of the highly probative nature of this evidence was a finding that it did not unfairly prejudice the defendant." *Thomas*, 986 F.3d at 730. For the reasons already stated, the threat evidence was probative of Han's money laundering with Mei, and, as the district court noted, Han's concerns about prejudice could "be addressed on cross-examination."

Moreover, while "[a]s a general proposition, … evidence of a defendant's threats to witnesses may pose a danger of unfair prejudice," *Jackson*, 70 F.4th at 1014, these threats are not particularly prejudicial. Mei's limited testimony about the threats covered only a handful of pages in a trial with thousands of pages of testimony from over a dozen witnesses. *See Jackson*, 898 F.3d at 764 (affirming the district court's decision to admit evidence that a defendant threatened to kill a witness, noting that "it constituted fewer than two pages of the over five hundred pages of testimony that the jury heard"). Accordingly, we see no abuse of discretion.

### C. Remark During Closing Arguments

Last, Han argues that a statement made by the prosecution during closing arguments necessitates a new trial because it infringed on his Fifth Amendment right to remain silent. Because Han did not object to this statement at trial, we review only for plain error. *See United States v. Harden*, 893 F.3d 434, 452 (7th Cir. 2018). "Under that standard, '[r]eversal is warranted only if we find an obvious (i.e., "plain") error that affected the outcome of the trial and seriously affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* (alteration in original) (quoting *United States v. Klemis*, 859 F.3d 436, 441 (7th Cir. 2017)). "A challenge of this kind is an uphill battle; 'improper statements during closing arguments rarely constitute reversible error.'" *Klemis*, 859 F.3d at 442 (quoting *United States v. Wolfe*, 701 F.3d 1206, 1211 (7th Cir. 2012)).

During closing arguments, the government contended that certain phone calls and texts proved a key element of the charge for operating an unlicensed money transmitting business: Han transferred money for people he did not know—customers, not friends or family. In response, Han argued that the evidence failed to prove that he transmitted money for strangers because the government did not identify the recipients of those calls and texts. Then, on rebuttal, the prosecution countered:

> Now you heard defense counsel talking about the phone evidence and how Special Agent Jennings wasn't able to identify every person in those text messages that w[ere] put forward, but neither was defendant. Defendant can't tell you who those people were because they were

> strangers. Defendant was making arrangements
> with strangers to meet in parking lots.

According to Han, this statement impermissibly commented on his decision not to testify and shifted the burden of proof.

Reviewing for plain error, we start with whether there was an error at all. "As a general matter, a misconduct claim of this type turns on whether the prosecutor's remarks were both improper and 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). When considering whether a remark resulted in an unfair trial, we "evaluate five factors: (1) the nature and seriousness of the alleged misconduct; (2) whether the defense invited prosecutor's statements; (3) whether the jury instructions adequately addressed the matter; (4) whether the defense had an opportunity to respond the improper remark; and (5) the weight of the evidence against the defendant." *Id.*

Even if we assume the government's statement inappropriately implicated Han's constitutional right to remain silent, the weight of the *Darden* factors tilts in the government's favor. Defense counsel invited the misconduct by commenting on the government's inability to identify the recipients (factor 2). The district court adequately instructed the jury that the government bore the burden of proof, Han was not required to produce any evidence, and that the attorneys' arguments were not evidence (factor 3). And the evidence of Han's guilt, "the most important" factor, was ample and compelling (factor 5). *Klemis*, 859 F.3d at 443 (citation and internal quotation marks omitted). Not only did the jury see text messages and phone and tax records documenting Han's money laundering and unlicensed money transmitting scheme, it heard

testimony from two cooperating witnesses about their inter-actions with Han. Roman and Mei both testified that they dropped off large quantities of drug proceeds for Han, a stranger, to launder. And Mei further testified that he gave Han wiring instructions to transfer the clean money as part of the scheme. Thus, the comment, inappropriate or not, does not constitute error under *Darden*, ending our analysis.

### III. Conclusion

For the reasons explained, the judgment of the district court is AFFIRMED.